IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PRISON LEGAL NEWS, DANIEL DENVIR, PHILADELPHIA CITY PAPER, CHRISTOPHER MORAFF, PENNSYLVANIA PRISON SOCIETY, SOLITARY WATCH, PROFESSOR REGINA AUSTIN, STEVEN BLACKBURN, WAYNE JACOBS, EDWIN DESAMOUR, and WILLIAM COBB, | CIVIL ACTION |
| Plaintiffs, | No. _____ |
| v. | |
| KATHLEEN KANE, in her capacity as Attorney General of Pennsylvania, and R. SETH WILLIAMS, in his capacity as District Attorney of Philadelphia County, | |
| Defendants. | |

## VERIFIED COMPLAINT

## PRELIMINARY STATEMENT

1.      On October 21, 2014, then-Pennsylvania Governor Tom Corbett signed into law a statute that violates the due process and First Amendment rights of a broad array of individuals and organizations.

2.      Dubbed the "Revictimization Relief Act" by its sponsors, this unprecedented statute, 18 Pa. C.S. § 11.1304, is more accurately described as the "Silencing Act." Indeed, at its signing, the Act was referred to as a means "to keep people like the murderer Mumia Abu-Jamal silent."

3.      While the Silencing Act was drafted in response to the graduating class of Goddard College's choice of Abu-Jamal as its commencement speaker, the Act's impact extends far beyond just Abu-Jamal. In fact, the Silencing Act permits courts to enjoin and penalize *any* speech or other conduct by an "offender" (undefined) that causes "mental anguish" to a personal injury crime "victim" (broadly defined) or otherwise "perpetuates the continuing effect of the crime on the victim" (not otherwise defined).

4.      Further, according to the legislative history, the Act applies to third parties who publish such speech.

5.      Plaintiffs are eleven individuals and organizations ensnared by the Silencing Act's broad and vague sweep. Each engages in speech that it is in the public's interest to encourage, not silence. Seven of the eleven are third parties

who rely on and publish speech by individuals convicted of personal injury crimes, in order to inform the public and spur government action regarding issues of public concern. Those issues include wrongful convictions, prison conditions, penal policy, juvenile life without parole, and clemency. The other four Plaintiffs are individuals formerly incarcerated for personal injury crimes who share their own experiences with a wide range of audiences to help reduce crime and facilitate successful prisoner reentry.

6.     To eliminate the threat the Silencing Act poses to them and so many others, Plaintiffs bring this action under 42 U.S.C. § 1983, seeking a declaration that the Act is unconstitutional and an injunction against its enforcement. As demonstrated below, the Silencing Act is unconstitutional in at least four different ways:

a.     *First*, the Silencing Act is unconstitutionally vague, as a potential target can only guess what conduct—or even whose conduct—falls within the statute's scope.

b.     *Second*, the Silencing Act unconstitutionally regulates speech based on its content, without any compelling government interest as a justification.

c.     *Third*, the Silencing Act is unconstitutionally overbroad, as most, if not all, of its applications impermissibly restrict protected speech.

d.    **Fourth**, the Silencing Act unconstitutionally authorizes courts to impose a prior restraint on speech—which, as the Supreme Court has observed, is the most serious and intolerable infringement on First Amendment rights.

## JURISDICTION & VENUE

7.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this suit raises federal questions under 42 U.S.C. § 1983 and under the First and Fourteenth Amendments to the United States Constitution.

8.    Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. §§ 1391(a) and 1391(b), as a substantial part of the events giving rise to this action occurred in this District and Defendant Kane resides in this District.

## THE PARTIES

9.    Plaintiffs *Prison Legal News*, Daniel Denvir, *Philadelphia City Paper*, Christopher Moraff, Pennsylvania Prison Society, Solitary Watch, and Professor Regina Austin rely on and publish speech by individuals convicted of personal injury crimes (as defined for purposes of the Silencing Act) to convey information of public concern. *Prison Legal News*, the *City Paper*, the Prison Society's "Graterfriends" newsletter, and Solitary Watch are publications that feature content that is written by or quotes Pennsylvania inmates convicted of personal injury crimes. Denvir, a *City Paper* senior staff writer who focuses on criminal justice issues, and Moraff, a freelance criminal justice journalist, are both working on

long-term pieces that would feature interviews with and comments from Pennsylvania inmates convicted of personal injury crimes. Professor Austin runs a University of Pennsylvania Law School program that, to support clemency applications of Pennsylvania prisoners, creates videos that contain oral or written testimonials by the prisoners themselves. These seven organizations and individuals all reasonably fear that the Silencing Act will be used to enjoin or penalize their publication of offender speech and that the Act will chill offenders from speaking with them—whether through interviews, written submissions, or otherwise.

10.    Plaintiffs Steven Blackburn, Wayne Jacobs, Edwin Desamour, and William Cobb were formerly incarcerated for personal injury crimes of which they were convicted in Philadelphia County—first-degree murder, involuntary manslaughter, third-degree murder, and kidnapping and robbery, respectively. Since being released from prison, they have drawn on their personal experiences with the justice system to become community leaders working to reduce crime. Through a combination of direct service and advocacy, they and the organizations they have founded and run have striven to help at-risk youth avoid lives of crime and to help those returning from prison reintegrate into their communities and avoid recidivism. Public speaking—through presentations, lectures, panel appearances, media interviews, legislative testimony, documentaries, and more—is

a key component of their efforts. Each of these four individuals reasonably fears that the Silencing Act will be used to enjoin or penalize such speech.[1]

11.     Defendant Kathleen Kane is the Attorney General of the Commonwealth of Pennsylvania and is sued in her official capacity. Defendant Kane, as Attorney General, acts under color of state law and has the authority to file suit under the Silencing Act. *See* 18 Pa. C.S. § 11.1304(b).

12.     Defendant R. Seth Williams is the District Attorney of Philadelphia and is sued in his official capacity. Defendant Williams, as District Attorney, acts under color of state law and has the authority to file suit under the Silencing Act. *See* 18 Pa. C.S. § 11.1304(b).

## THE SILENCING ACT'S BROAD AND UNCLEAR SWEEP

13.     Signed into law on October 21, 2014, as an amendment to Pennsylvania's 1998 Crime Victims Act, the Silencing Act provides in full:

> (a) ACTION.-- In addition to any other right of action and any other remedy provided by law, a victim of a personal injury crime may bring a civil action against an offender in any court of competent jurisdiction to obtain injunctive and other appropriate relief, including reasonable attorney fees and other costs associated with the litigation, for conduct which perpetuates the continuing effect of the crime on the victim.

---

[1] More fulsome descriptions of Plaintiffs and the Silencing Act's effect on them are at Paragraphs 47-150.

(b) REDRESS ON BEHALF OF VICTIM.-- The district attorney of the county in which a personal injury crime took place or the Attorney General, after consulting with the district attorney, may institute a civil action against an offender for injunctive or other appropriate relief for conduct which perpetuates the continuing effect of the crime on the victim.

(c) INJUNCTIVE RELIEF.-- Upon a showing of cause for the issuance of injunctive relief, a court may issue special, preliminary, permanent or any other injunctive relief as may be appropriate under this section.

(d) DEFINITION.-- As used in this section, the term "conduct which perpetuates the continuing effect of the crime on the victim" includes conduct which causes a temporary or permanent state of mental anguish.

18 Pa. C.S. § 11.1304.

14.     As this reproduction of its entire text makes clear, the Silencing Act does not define the term "offender." Nor does the rest of the Crime Victims Act.

15.     While the Silencing Act states that "the term 'conduct which perpetuates the continuing effect of the crime on the victim' includes conduct which causes a temporary or permanent state of mental anguish," both it and the rest of the Crime Victims Act are silent about what else "conduct which perpetuates the continuing effect of the crime on the victim" "includes."

16.     The definitions section of the Crime Victims Act does contain three relevant definitions, which collectively broaden the scope of the Silencing Act beyond its plain language.

17.    First, the Crime Victims Act defines "personal injury crime" as "[a]n act, attempt or threat to commit an act which would constitute a misdemeanor or felony" under the sections of the Pennsylvania Crimes Code relating to "criminal homicide," "assault," "kidnapping," "sexual offenses," "arson and related offenses," "robbery," "victim and witness intimidation," and various vehicular crimes resulting in death or bodily injury.  18 Pa. C.S. § 11.103.

18.    Second, the Crime Victims Act defines "victim" to include all of the following:

> (1) A direct victim.
>
> (2) A parent or legal guardian of a child who is a direct victim, except when the parent or legal guardian of the child is the alleged offender.
>
> (3) A minor child who is a material witness to any of the following crimes and offenses . . . committed or attempted against a member of the child's family: . . criminal homicide [,] aggravated assault[,] rape[.]
>
> (4) A family member of a homicide victim, including stepbrothers or stepsisters, stepchildren, stepparents or a fiancé . . . except where the family member is the alleged offender.

*Id.*

19.    Third, the Crime Victims Act defines "family," "when used in reference to an individual"—as in the fourth part of the "victim" definition—to encompass:

> (1) anyone related to that individual within the third
> degree of consanguinity or affinity;
>
> (2) anyone maintaining a common-law relationship with
> that individual; or
>
> (3) anyone residing in the same household with that
> individual.

*Id.*

20.    An individual's spouse and the individual's or his or her spouse's children, parents, siblings, grandchildren, grandparents, nephews, nieces, uncles, aunts, great-grandchildren, and great-grandparents are all "within the third degree of consanguinity or affinity."

## THE SILENCING ACT'S LIGHTNING-SPEED ENACTMENT

21.    While many statutes are the product of months, if not years, of drafting, debate, hearings, negotiations, and revisions, the Silencing Act took only three weeks to progress from a legislator's idea to a ratified bill signed by the Governor.

22.    On September 29, 2014, Goddard College, a small school in Vermont, announced that the undergraduate graduating class had selected Mumia Abu-Jamal, a Goddard alumnus, to be its commencement speaker.  (Ex. 1 (Sept. 29, 2014 Goddard Press Release).)

23. According to the announcement, Prison Radio had already pre-recorded Abu-Jamal's address, which would be played at the October 5 commencement ceremony. (*Id.*)

24. On September 30, after hearing the news, Maureen Faulkner—the widow of the police officer whom Abu-Jamal was convicted of murdering—told Fox News how upset it made her:

> I am just absolutely outraged that they would have such a hate-filled murderer on as a commencement speaker. I mean, this man—he murdered my husband with malice and premeditation. He is evil. . . . And I still do not understand this justice system and why they are allowing him to speak.

(Ex. 2 (Sept. 30, 2014 Interview Transcript) at 2.)

25. On October 2, State Representative Mike Vereb, who was running for reelection to the Pennsylvania House at the time, introduced the Silencing Act.

26. Representative Vereb circulated a co-sponsor memo in which he stated that Mrs. Faulkner's situation was his motivation for the Silencing Act but that the law would affect far more than just her and Abu-Jamal:

> A convicted murderer is still traumatizing the victim's family and it needs to stop. We need to ensure this doesn't happen to any other victim or their family. . . .
>
> Officer Faulkner's wife Maureen was left a widow by Abu-Jamal. But not only did Maureen lose her husband and the life she hoped to lead with him, Maureen also since has been revictimized again and again by Abu-

> Jamal's ongoing acts.  It is time to put a stop to this, not
> only for Maureen, but for all victims of personal crimes.

(Ex. 3 (Oct. 2, 2014 Co-Sponsor Memo).)

27.     On October 5, Abu-Jamal's pre-recorded speech was played for the

Goddard graduates.  In his speech, Abu-Jamal did not mention his crime or Mrs.

Faulkner.  Instead, he reflected on his experience as a Goddard student and urged

the graduates to "take what you know and apply it in the real world" and to "help

be the change you're seeking to make."  (Ex. 4 (Oct. 5, 2014 Commencement

Speech Transcript).)

28.     The House Judiciary Committee's October 6 session included less

than fifteen minutes of discussion of the Silencing Act.  (A video of the Judiciary

Committee's session is at http://media2.pahousegop.com/Generator.asp?

videoname=860041361.wmv.)

29.     In his opening comments, the Committee Chairman explained that the

bill related to Abu-Jamal's commencement address and stated that he could "not

express his disdain enough" for Goddard's "unworthy" and "despicable" decision

to "allow a cold-blooded murderer to engage in this conduct" that, in the

Chairman's view, would cause "extreme distress" to Officer Faulkner's family.

30.     But in the ensuing discussion, comments by the Committee Counsel

highlighted the bill's broad—though not at all clear—reach beyond Abu-Jamal.

31.     One representative asked if the law would affect a program in which

prisoners speak to high schools to encourage students to stay on the right path and

out of jail.

32.     The Committee Counsel responded by emphasizing that the Silencing

Act, by design, gives the court tremendous discretion in applying it:

> The bill is constructed to give a lot of discretion to the
> judge here because there is not an ability to foresee all
> the different types of situations where something could
> come up where there is conduct by an offender, so it is
> designed as you read the language, only in those
> situations where it causes this kind of emotional distress
> to the victim . . . . And also, it's not mandatory. The
> judge has to exercise his or her equitable discretion and
> to see whether this is a situation where an injunction is
> called for or that constitutionally is permissible and
> exercise their discretion to make sure to do that properly.

33.     Then, when asked if the law would reach a third party who published

offender speech, the Committee Counsel said that "the court would have broad

power to stop a third party who is the vessel of that conduct or speech from

delivering it or publishing that information."

34.     At a press conference later that day, both Governor Corbett and

Defendant and Philadelphia District Attorney Williams spoke enthusiastically in

favor of the Silencing Act, lambasting Goddard and Abu-Jamal for causing Mrs.

Faulkner pain but also highlighting the impact that the law could have on other

victims. (A video of the press conference is at http://media2.pahousegop.com/ Generator.asp?videoname=402857958.wmv.)

35.    Governor Corbett, who was up for reelection less that one month later, stressed that the law would "prevent convicted violent felons from every day revictimizing families and other injured parties by using public venues to promote themselves and their own agenda truly at the emotional expense of the victims and of the public."

36.    Defendant Williams described the Silencing Act as "allow[ing] victims or prosecutors on behalf of a victim to stop their offenders from revictimizing them," pronounced that the law "is the least we can do for our victims," and told the assembled crowd, "[t]hank you for standing up, thank you for not forgetting about our victims."

37.    State Senator John Rafferty—also in the midst of a reelection campaign—spoke, too, vowing to "make sure this bill gets through the Senate [with] quick passage and to the Governor for his signature."

38.    Just over one week later, on October 15, 2014, the House passed the Silencing Act unanimously.

39.    On October 16, 2014, the Senate passed the Silencing Act—by a 37-11 vote.

40.   Not a single change was made to the text of the Silencing Act between its introduction and its passage.

41.   Governor Corbett then signed the Silencing Act into law on October 21, 2014, near the Philadelphia intersection where Officer Faulkner was murdered. (A video of the bill-signing ceremony is at https://www.youtube.com/watch?v=e38fGnlGYs4&feature=youtu.be.)

42.   As emcee of the bill-signing ceremony, the Commonwealth's Victim Advocate lauded the Silencing Act as "groundbreaking legislation that currently does not exist in any other state."

43.   At the ceremony, Senator Rafferty did not mince words in describing what he saw as the Silencing Act's impact:

> It will finally allow the families of crime victims or the crime victims themselves, if they are still with us, or the DA or the Attorney General to go to court to seek an injunction to prevent these rascals, these bad people, from becoming entertainment values here in the Commonwealth of Pennsylvania. . . .
>
> This is important for Pennsylvania, for the City of Philadelphia, to allow us as a civilized society to say "no more, you've hurt us enough criminals, stay back where you belong, this is our country, this is our Commonwealth, let us go forward and heal."

44.   Expressing a similar sentiment, Representative Vereb lamented that "[f]or too long, Pennsylvania has sat by and watched as victims like Maureen

Faulkner were victimized over and over again by low life criminals" and praised the law for standing up for "the victims" instead of "the villains."

## THE SILENCING ACT'S IMPACT

45.    Now that the Silencing Act has taken effect, the prospect of its enforcement—and the injunctive and monetary relief that the law authorizes— looms for thousands of implicated individuals and organizations.

46.    Eleven of them are Plaintiffs here.

### *Prison Legal News*

47.    Plaintiff *Prison Legal News* ("PLN"), a project of the non-profit Human Rights Defense Center, is a monthly magazine that reports on criminal justice issues and prison- and jail-related civil litigation, with an emphasis on prisoners' rights. Approximately 95% of PLN's content is written by current or former inmates.

48.    PLN has published articles written by current and former Pennsylvania inmates convicted of personal injury crimes in Philadelphia and elsewhere in Pennsylvania, including articles written by Mumia Abu-Jamal, who was convicted of Officer Faulkner's murder in Philadelphia.

49.    Abu-Jamal recently submitted an article to PLN that PLN wants to publish, but it has not published the article yet due to the threat that the Silencing Act poses.

50.    PLN cannot know in advance if the publication of an article by a person convicted of a personal injury crime will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular article.

51.    But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims— like Mrs. Faulkner—to learning of speech by a person convicted of the crime, PLN reasonably believes that at least some of the articles that it wants to publish will fall within the Act's scope.

52.    PLN intends to continue to publish articles written by current and former Pennsylvania inmates convicted of personal injury crimes in Philadelphia and elsewhere in Pennsylvania, but reasonably fears that the Silencing Act will be used in an effort to enjoin it from, or penalize it for, publishing such articles.

53.    PLN also reasonably fears that current and former Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will be chilled from submitting articles for publication due to the risk that the Silencing Act would be used to enjoin or penalize their speech.

54.     PLN cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### *Daniel Denvir*

55.     Plaintiff Daniel Denvir is a senior staff writer at the *Philadelphia City Paper*. His reporting on a wide range of criminal justice issues has appeared in the *City Paper*, as well as *The New Republic* and *The Atlantic*'s CityLab.

56.     Denvir was a 2013 Guggenheim Reporting Fellow at John Jay College of Criminal Justice in New York City. The Reporting Fellowship is aimed at encouraging and promoting top-quality journalism on criminal justice.

57.     In his criminal justice reporting, Denvir often relies on interviews with and comments from Pennsylvania inmates convicted of personal injury crimes in Philadelphia.

58.     For example, in 2013, Denvir wrote a series of articles in the *City Paper* about evidence suggesting that Pennsylvania inmates Eugene Gilyard and Lance Felder were innocent of the Philadelphia murder for which they had been convicted. Denvir interviewed Gilyard in prison for the series, and included comments from him in the articles.

59.     The first article in the series prompted a key defense witness to come forward and testify at a Post-Conviction Relief Act hearing, after which the court

granted Gilyard and Felder a new trial.  Defendant Williams then chose to drop the charges against Gilyard and Felder instead of retrying them, and the two are now free.

60.    For his series on Gilyard and Felder, Denvir received the 2014 Public Service Award from the Association of Alternative Newsmedia.

61.    Since his articles on Gilyard and Felder, Denvir has continued to investigate potential wrongful convictions of Pennsylvania inmates for personal injury crimes and wants to publish additional reporting on the subject in the near future that quotes from one or more Pennsylvania inmates convicted of personal injury crimes.

62.    Denvir cannot know in advance if an article quoting a person convicted of a personal injury crime will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish."  *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular article.

63.    But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, Denvir reasonably believes that criminal justice reporting that he wants to publish in the future quoting

Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will fall within the Act's scope.

64.    Denvir intends to continue to rely on and include in his criminal justice reporting interviews with and comments from Pennsylvania inmates convicted of personal injury crimes in Philadelphia and elsewhere in Pennsylvania, but reasonably fears that the Silencing Act will be used in an effort to enjoin him from, or penalize him for, publishing such reporting.

65.    Denvir also reasonably fears that Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will be chilled from speaking with him in connection with his criminal justice reporting—be it about wrongful convictions, correctional officer abuse, sentencing policies, proposed legislation impacting inmates, or otherwise—due to the risk that the Silencing Act would be used to enjoin or penalize their speech.

66.    Denvir cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### *Philadelphia City Paper*

67.    Plaintiff *Philadelphia City Paper* is a prize-winning and independent alternative weekly newspaper that publishes fresh perspectives on local news, arts, music, movies, and food.

68.    The *City Paper* frequently features content on local criminal justice issues, which has often included interviews with or comments from Pennsylvania inmates convicted of personal injury crimes in Philadelphia.  For example, the *City Paper* published the series by Plaintiff Denvir described at Paragraphs 58-60 above, as well as a story on the community-building efforts of Plaintiffs Jacobs and Blackburn—both formerly incarcerated for personal injury crimes—that quoted the two men extensively.

69.    The *City Paper* wants to publish future reporting by Denvir on his continuing investigation, as a *City Paper* employee, of potential wrongful convictions of Pennsylvania inmates for personal injury crimes.

70.    The *City Paper* cannot know in advance if an article quoting a person convicted of a personal injury crime will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular article.

71.    But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, the *City Paper* reasonably believes that content that the *City Paper* wants to publishes in the future quoting Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will fall within the Act's scope.

72.    The *City Paper* intends to continue to publish content that includes interviews with and comments from Pennsylvania inmates convicted of personal injury crimes in Philadelphia and elsewhere in Pennsylvania, but reasonably fears that the Silencing Act will be used in an effort to enjoin it from, or penalize it for, publishing such content.

73.    The *City Paper* also reasonably fears that Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will be chilled from speaking with its reporters due to the risk that the Silencing Act would be used to enjoin or penalize their speech.

74.    The *City Paper* cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

75.    The *City Paper* cannot afford to devote resources to the researching and writing of a long-term article only to ultimately be enjoined from publishing it.

76.    The *City Paper* cannot afford to devote resources to the researching and writing of a long-term article only to have key sources chilled from speaking with its reporters due to the threat that the Silencing Act poses to them.

### Christopher Moraff

77.    Plaintiff Christopher Moraff is a freelance journalist whose reporting on a wide range of criminal justice issues has appeared in publications including *The Daily Beast*, *The Philadelphia Tribune*, *Philadelphia Magazine*, PennLive, *The Philadelphia Inquirer*, *In These Times*, *Next City*, *Al Jazeera America*, and *The American Prospect*.

78.    Moraff is a 2014 Guggenheim Reporting Fellow at John Jay College of Criminal Justice in New York City.  As discussed above, the Reporting Fellowship is aimed at encouraging and promoting top-quality journalism on criminal justice.

79.    Moraff is currently working on two long-term articles entailing interviews with Pennsylvania inmates who have been convicted of personal injury crimes.

80.    The first is an article that would put a human face on mandatory juvenile life without parole in Pennsylvania, by sharing the stories of several Pennsylvania inmates who are serving mandatory life sentences for personal injury crimes they committed as juveniles.  One of the inmates whom Moraff has

identified as a potential subject for this article is Robert Holbrook, a Pennsylvania inmate convicted of a Philadelphia murder over twenty years ago. Holbrook, who has spoken publicly and with the press in the past about his experiences as a juvenile lifer, has said in a separate suit challenging the Silencing Act's constitutionality that the Act now chills his exercise of his right to speak about his experiences.

81.   The second article is about the low percentage of clemency applications granted in Pennsylvania. For that article, Moraff is reviewing records from the hundreds of applications denied last year—again, with the goal of identifying several inmates to interview about their personal stories.

82.   Moraff cannot know in advance if an article quoting a person convicted of a personal injury crime will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304. It all depends on the reaction of the particular "victim" to the particular article.

83.   But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, Moraff reasonably believes that the articles on which he is working about juvenile life without parole and about denied clemency applications will fall within the Act's scope.

84. Moraff intends to continue to rely on and include in his criminal justice reporting interviews and comments from Pennsylvania inmates convicted of personal injury crimes, but reasonably fears that the Silencing Act will be used in an effort to enjoin him from, or penalize him for, publishing such reporting.

85. Moraff also reasonably fears that Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will be chilled from speaking with him about their experiences as juvenile lifers or as clemency applicants due to the risk that the Silencing Act would be used to enjoin or penalize their speech.

86. Moraff cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

87. Moraff cannot afford to devote resources to researching and writing a long-term article only to ultimately be enjoined from publishing it.

88. Moraff cannot afford to devote resources to researching and writing a long-term article only to have key sources chilled from speaking with him due to the threat that the Silencing Act poses to them.

*Pennsylvania Prison Society*

89.     Plaintiff Pennsylvania Prison Society is a nonprofit organization that advocates for a humane, just, and restorative correctional system and promotes a rational approach to criminal justice issues in the Commonwealth of Pennsylvania.

90.     As part of its mission to maintain communication between prisoners and the outside community, the Prison Society publishes "Graterfriends," a newsletter in which prisoners and non-prisoners voice their opinions and concerns about criminal justice issues.

91.     Most articles submitted to and published in Graterfriends are by Pennsylvania inmates, many of whom have been convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania.  The Prison Society reviews each submission it receives and retains the right to edit or reject any submission.

92.     The Prison Society cannot know in advance if an article by a person convicted of a personal injury crime will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular article.

93.     But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, the Prison Society

reasonably believes that at least some of the articles it wants to publish in Graterfriends will fall within the Act's scope.

94.     The Prison Society intends to continue to publish articles in Graterfriends written by Pennsylvania inmates convicted of personal injury crimes in Philadelphia and elsewhere in Pennsylvania, but reasonably fears that the Silencing Act will be used in an effort to enjoin it from, or penalize it for, publishing such articles.

95.     The Prison Society also reasonably fears that Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will be chilled from submitting articles for publication in Graterfriends due to the risk that the Silencing Act would be used to enjoin or penalize their speech.

96.     In fact, the Prison Society feels obliged to, and intends to, warn inmates of the injunctive and monetary threat that the Silencing Act poses, so that inmates can decide whether to submit articles for publication in Graterfriends in light of that threat.

97.     The Prison Society cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### *Solitary Watch*

98.    Plaintiff Solitary Watch is a nonprofit web-based project aimed at bringing the widespread use of solitary confinement out of the shadows and into the light of the public square.  It is the first centralized source of unfolding news, original reporting, first-hand accounts, and background research on solitary confinement in the United States.

99.    The first-hand accounts of solitary confinement that Solitary Watch publishes are drawn from inmate letters.

100.   Solitary Watch has received letters with first-hand accounts of solitary confinement from Pennsylvania inmates who have been convicted of personal injury crimes, and it has published some of those first-hand accounts.

101.   Solitary Watch cannot know in advance if a first-hand account of solitary confinement by a person convicted of a personal injury crime will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular account.

102.   But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, Solitary Watch reasonably

believes that at least some of the first-hand accounts of solitary confinement it wants to publish will fall within the Act's scope.

103.   Solitary Watch intends to continue to publish first-hand accounts of solitary confinement by Pennsylvania inmates convicted of personal injury crimes, but reasonably fears that the Silencing Act will be used in an effort to enjoin it from, or penalize it for, publishing such accounts.

104.   Solitary Watch also reasonably fears that Pennsylvania inmates convicted of personal injury crimes will be chilled from submitting accounts of their experiences in solitary confinement for publication due to the risk that the Silencing Act would be used to enjoin or penalize their speech.

105.   Solitary Watch cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### *Professor Regina Austin*

106.   Plaintiff Regina Austin is the William A. Schnader Professor of Law at the University of Pennsylvania School  of Law, where she directs a program called the Penn Program on Documentaries and the Law.

107.   As part of the Documentaries and the Law program, Professor Austin and her students create videos to support the clemency applications of Pennsylvania inmates, including inmates convicted of personal injury crimes.

Clemency includes both pardons and commutations of sentences. A request for clemency is basically a plea for mercy.

108. Because Pennsylvania's clemency standards require the demonstration of remorse and rehabilitation, the videos that Professor Austin and her students help create generally include oral or written testimonials by applicants describing the details and circumstances of their crimes, describing the positive changes they have made in their lives since the time of their crimes, acknowledging responsibility for their crimes, and apologizing to the victims and survivors.

109. Indeed, Pennsylvania's clemency application requires applicants to "[s]tate the details of the crime(s) for which you are requesting a Pardon or Commutation," including by answering the questions "[w]here were you, what exactly did you do, and how were you apprehended?" The application emphasizes that "Applicant must complete in his/her own words!" Moreover, Pennsylvania requires that victims or next of kin be notified of clemency applications and given the opportunity to appear at the applicant's hearing.

110. Professor Austin cannot know in advance if a clemency video will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304. It all depends on the reaction of the particular "victim" to the particular video.

111.    But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, Professor Austin reasonably believes that at least some of the clemency videos she wants to create and disseminate will fall within the Act's scope.

112.    Professor Austin intends to continue working with her students to create videos featuring testimonials by Pennsylvania inmates seeking clemency who have been convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania, but she reasonably fears that the Silencing Act will be used in an effort to enjoin her from, or penalize her for, creating or disseminating such videos.

113.    Professor Austin also reasonably fears that Pennsylvania inmates convicted of personal injury crimes in Philadelphia or elsewhere in Pennsylvania will be chilled from speaking with her and using her video services in connection with their clemency applications, due to the risk that the Silencing Act would be used to enjoin or penalize their speech.

114.    Professor Austin cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### *Steven Blackburn*

115.   In 1978, Plaintiff Steven Blackburn was convicted of first-degree murder in Philadelphia—a personal injury crime for purposes of the Silencing Act—and sentenced to life in prison.

116.   Blackburn was pardoned by Pennsylvania Governor Robert Casey in 1991, after serving sixteen years in prison.

117.   In 2000, Blackburn co-founded X-Offenders for Community Empowerment, a nonprofit organization in Philadelphia with a mission to empower formerly incarcerated people to become change agents in mobilizing the community to reduce recidivism and address issues threatening healthy family and community life.  Blackburn is currently the organization's board president.

118.   As X-Offenders for Community Empowerment's co-founder and board president and as an individual who himself was incarcerated, Blackburn has frequently engaged in public speaking about prisoner reentry and other criminal justice issues.  He has testified before the Pennsylvania legislature, is often invited to speak at universities, and has been interviewed by the *Philadelphia Daily News* and *Philadelphia City Paper*.

119.   Blackburn cannot know in advance if an interview, legislative testimony, or other form of public speaking will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or

permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular speech.

120.  But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, Blackburn reasonably believes that at least some of the public speaking in which he wants to engage will fall within the Act's scope.

121.  Blackburn intends to continue to give media interviews, provide legislative testimony, and engage in other public speaking that furthers the mission of X-Offenders for Community Empowerment, but reasonably fears that the Silencing Act will be used in an effort to enjoin him from, or penalize him for, doing so

122.  Blackburn cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### *Wayne Jacobs*

123.  In 1995, Plaintiff Wayne Jacobs was convicted of involuntary manslaughter in Philadelphia—a personal injury crime for purposes of the Silencing Act—and sentenced to eleven to twenty-three months in prison.

124.  Jacobs was released from prison in 1997.

125.   In 2000, Jacobs co-founded X-Offenders for Community Empowerment with Plaintiff Blackburn, the mission of which is described at Paragraph 117 above. He is currently the organization's executive director.

126.   As X-Offenders for Community Empowerment's co-founder and executive director and as an individual who himself was incarcerated, Jacobs has frequently engaged in public speaking about issues related to crime, prisoner reentry, and recidivism. He has been interviewed by many Philadelphia-area media outlets, including the *Philadelphia Daily News* and *Philadelphia City Paper*.

127.   Jacobs wants to run for the position of Philadelphia City Commissioner in 2015.

128.   Jacobs cannot know in advance if an interview, campaign address, or other form of public speaking, or even the mere existence of his campaign for office, will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304. It all depends on the reaction of the particular "victim" to the particular speech or other conduct.

129.   But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech or other conduct by a person convicted of the crime, Jacobs

reasonably believes that at least some of the public speaking or conduct in which he wants to engage will fall within the Act's scope.

130.  Jacobs intends to continue to give media interviews and engage in other public speaking that furthers the mission of X-Offenders for Community Empowerment and intends to run for public office in 2015, but reasonably fears that the Silencing Act will be used in an effort to enjoin him from, or penalize him for, doing so.

131.  Jacobs cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### *Edwin Desamour*

132.  In 1991, when he was sixteen years old, Plaintiff Edwin Desamour was convicted of third-degree murder in Philadelphia—a personal injury crime for purposes of the Silencing Act—and sentenced to seven to twenty years in prison.

133.  Desamour was released from prison in 1997.

134.  In 2007, Desamour founded Men in Motion in the Community ("MIMIC"), a nonprofit organization in Philadelphia with a mission to help high-risk youth, young adults, and formerly incarcerated men through mentoring, community engagement, and educational enrichment.  Desamour is the organization's executive director.

135.  As MIMIC's founder and executive director and as an individual who himself was convicted and incarcerated as a juvenile, Desamour has frequently engaged in public speaking about juvenile justice issues.  He has been interviewed by national media, including CNN, ABC News, *The Washington Post*, and *USA Today*; has testified before the Pennsylvania legislature; and is featured in a documentary about juvenile justice to be released in 2016.

136.  Desamour cannot know in advance if an interview, legislative testimony, or other form of public speaking will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular speech.

137.  But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, Desamour reasonably believes that at least some of the public speaking in which he wants to engage will fall within the Act's scope.

138.  Desamour intends to continue to give media interviews, provide legislative testimony, and engage in other public speaking that furthers MIMIC's mission and intends to appear in the upcoming documentary, but reasonably fears

that the Silencing Act will be used in an effort to enjoin him from, or penalize him for, doing so.

139.   Desamour cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

### William Cobb

140.   In 1994, Plaintiff William Cobb was convicted of robbery and kidnapping in Philadelphia—personal injury crimes for purposes of the Silencing Act—and sentenced to six-to-twelve years in prison.

141.   Cobb was released from prison in 2000.

142.   Over the past ten years, Cobb has frequently engaged in public speaking about his crime, his years in prison, and the hardships that he has faced and tried to overcome as an individual with a criminal record.

143.   Through this public speaking—at venues including schools, churches, prisons, and community-based organizations—Cobb has encouraged at risk youth and formerly incarcerated individuals to turn away from crime and violence and has advocated for the easing of employment barriers for people with criminal records.

144.   For the past two years, Cobb has been writing a book about his crime, his years in prison, and the hardships that he has faced and tried to overcome as an

individual a criminal record.  He is currently looking for an agent and shopping the book to publishers.

145.  In addition, Cobb is launching a nonprofit organization called "Redeemed," the mission of which is to eliminate—through education, advocacy, and activism—systemic employment discrimination practices aimed at people living with arrests and convictions.  Redeemed's success depends on Cobb sharing his own personal experiences with crime and the employment obstacles that a criminal record often brings with it.

146.  Cobb cannot know in advance if a public speaking engagement or a part of his book will be held to "perpetuate[] the continuing effect of the crime on the victim," such as by "caus[ing] a temporary or permanent state of mental anguish." *See* 18 Pa. C.S. § 11.1304.  It all depends on the reaction of the particular "victim" to the particular speech or part of his book.

147.  But given the broad definition of personal injury crime "victim" for Silencing Act purposes, and given the natural sensitivity of many such victims to learning of speech by a person convicted of the crime, Cobb reasonably believes that at least some of the public speaking in which he wants to engage and at least some of his book will fall within the Act's scope.

148.  Cobb intends to continue to engage in public speaking that furthers Redeemed's mission and that encourages others to turn away from crime and

violence, but reasonably fears that the Silencing Act will be used in an effort to enjoin him from, or penalize him for, doing so.

149.   In addition, Cobb intends to continue to work on his book about his personal experiences, but reasonably fears that the Silencing Act will be used to enjoin him from, or penalize him for, publishing it.

150.   Cobb cannot afford to devote resources to defending against Silencing Act lawsuits or to paying awards of attorneys' fees, court costs, or damages under the Act.

## CLAIMS

### Count I:
### Impermissible Vagueness, in Violation of the Due Process Clause of the Fourteen Amendment to the United States Constitution and in Violation of the First Amendment to the United States Constitution
### (42 U.S.C. § 1983)

151.   All preceding paragraphs in this Complaint are incorporated here.

152.   The Silencing Act is impermissibly vague, in violation of the Fourteenth Amendment's Due Process Clause and the First Amendment, because it raises and leaves unanswered crucial questions about what speech and other conduct—and even whose conduct—it actually reaches.

153.   *First*, it is impossible for those subject to the Silencing Act to know before engaging in speech or other conduct whether the statute would proscribe or penalize it.  What will cause a "victim"—broadly defined for Silencing Act

purposes—mental anguish all depends on that particular victim's sensibilities. Further, the Silencing Act provides that "'conduct which perpetuates the continuing effect of the crime on the victim' *includes* 'conduct which causes a temporary or permanent state of mental anguish,'" 18 P.S. § 11.1304(d) (emphasis added), but gives no guidance about what else "conduct which perpetuates the continuing effect of the crime on the victim" includes.

154. *Second*, the Silencing Act does not define "offender." Nor does any other section of the Crime Victims Act—the statute to which the Silencing Act is an amendment. Therefore, it is unclear whether "offender" status for Silencing Act purposes requires conviction, incarceration, or merely proof of criminal conduct by a preponderance of the evidence in a civil action under the law.

155. *Third*, it is also unclear whether the Silencing Act permits the injunction of a third party's publication of offender speech. The statute itself only speaks explicitly of an action against an offender, but, as discussed above, at the House Judiciary Committee hearing on the law, the Committee Counsel stated that "the court would have broad power to stop a third party who is the vessel of that . . . conduct or speech from delivering or publishing that information." Indeed, it was a third party that pre-recorded Abu-Jamal's commencement address—even before Goddard announced that Abu-Jamal would be the commencement speaker—and then broadcast it to the students at Goddard.

156.   The Silencing Act and the threat of Defendants' enforcement of it, under color of state law, are therefore depriving Plaintiffs of rights secured by the Due Process Clause of the Fourteenth Amendment and by the First Amendment, as applied to the states by the Fourteenth Amendment.

157.   This constitutional violation is causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

### Count II:
### Impermissible Content-Based Speech Restriction, in Violation of the First Amendment to the United States Constitution
### (42 U.S.C. § 1983)

158.   All preceding paragraphs in this Complaint are incorporated here.

159.   Because the Silencing Act provides for injunctions and monetary relief based upon the reactions of victims and their families to offenders' speech, the statute's regulation of speech is content-based.

160.   No compelling interest justifies the Silencing Act's content-based regulation of speech—let alone a compelling interest that the Act is narrowly tailored to serve.

161.   The Silencing Act thus fails under a strict scrutiny analysis and violates the First Amendment.

162.   The Silencing Act and the threat of Defendants' enforcement of it, under color of state law, are therefore depriving Plaintiffs of rights secured by the First Amendment, as applied to the states by the Fourteenth Amendment.

163.   This constitutional violation is causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

## Count III:
### Impermissible Overbreadth, in Violation of the First Amendment to the United States Constitution
### (42 U.S.C. § 1983)

164.   All preceding paragraphs in this Complaint are incorporated here.

165.   The Silencing Act is impermissibly overbroad, in violation of the First Amendment, because a substantial number of its applications prohibit or penalize constitutionally protected speech, judged in relation to its non-existent legitimate sweep.

166.   In fact, because of the extraordinary range of offender speech that could cause a victim mental anguish, the Silencing Act could be used to prohibit or penalize any of the following—by an offender him- or herself, or by an offender via a third party:

a.     Filing a direct appeal from a conviction or sentence;

b.     Filing a habeas petition or pardon application;

c.     Publicly claiming to be innocent;

d.     Confessing or apologizing to a victim or doing so publicly to society in general;

    e.    Advocating for improved prison conditions, criminal or juvenile justice reform, or the easing of employment barriers for people with criminal records;

    f.    Sharing the offender's story with at-risk youth to encourage them to stay in school and avoid a life of crime; or

    g.    Giving a public speech or publishing a poem, book, or article—about any topic whatsoever.

167. The Silencing Act and the threat of Defendants' enforcement of it, under color of state law, are therefore depriving Plaintiffs of rights secured by the First Amendment, as applied to the states by the Fourteenth Amendment.

168. This constitutional violation is causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

### Count IV:
### Impermissible Authorization of Prior Restraints, in Violation of the First Amendment to the United States Constitution
### (42 U.S.C. § 1983)

169. All preceding paragraphs in this Complaint are incorporated here.

170. The Silencing Act authorizes courts to impose prior restraints on offender speech.

171. No sufficiently weighty justification supports the Silencing Act's authorization of prior restraints.

172.   The Silencing Act's authorization of prior restraints thus violates the First Amendment.

173.   The Silencing Act and the threat of Defendants' enforcement of it, under color of state law, are therefore depriving Plaintiffs of rights secured by the First Amendment, as applied to the states by the Fourteenth Amendment.

174.   This constitutional violation is causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.   Enter a declaratory judgment that 18 Pa. C.S. § 11.1304 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and violates the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, because it is impermissibly vague;

2.   Enter a declaratory judgment that 18 Pa. C.S. § 11.1304 violates the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, because it restricts speech based on content and is not justified by any compelling government interest that it is narrowly tailored to serve;

3.    Enter a declaratory judgment that 18 Pa. C.S. § 11.1304 violates the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, because it is impermissibly overbroad;

4.    Enter a declaratory judgment that 18 Pa. C.S. § 11.1304 violates the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, because it is impermissibly authorizes the imposition of prior restraints;

5.    Enter injunctive relief—preliminary and permanent thereafter—enjoining Defendants from enforcing 18 Pa. C.S. § 11.1304;

6.    Award costs of suit, including reasonable attorneys' fees under 42 U.S.C. § 1988; and

7.    Enter all further relief to which Plaintiffs may be justly entitled.

Date:  January 8, 2015                    Respectfully submitted,

Amy B. Ginensky (PA 26233)*
Eli Segal (PA 205845)*
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
(215) 981-4000
*Attorneys for Plaintiffs*

Thomas B. Schmidt, III (PA 19196)
Tucker R. Hull (PA 306426)
PEPPER HAMILTON LLP
100 Market Street, Suite 200
Harrisburg, PA 17108-1181
(717) 255-1155
*Attorneys for Plaintiffs*

Witold J. Walczak (PA 62976)
Sara J. Rose (PA 204936)
AMERICAN CIVIL LIBERTIES
FOUNDATION OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA  15213
(412) 681-7864
*Attorneys for Plaintiffs*

Seth F. Kreimer (PA 26102)
3400 Chestnut Street
Philadelphia, PA 19104
(215) 898-7447
*Attorney for Plaintiffs*

Lance Weber (FL 104550)*
Sabarish Neelakanta (FL 26623)*
HUMAN RIGHTS DEFENSE CENTER
PO Box 1151
Lake Worth, FL 33460
(561) 360-2523
*Attorneys for Plaintiff Prison Legal News*

*\*pro hac vice* application to be submitted

## VERIFICATION

I, Paul Wright, am the Editor of *Prison Legal News* and am authorized to execute this Verification on its behalf. I have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to *Prison Legal News* specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on January 6, 2015

_____
Paul Wright

## VERIFICATION

I, Daniel Denvir, have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to me specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on  1-6-15

Daniel Denvir

## VERIFICATION

I, Lillian Swanson, am Editor in Chief of the *Philadelphia City Paper* and am authorized to execute this Verification on its behalf. I have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to the *Philadelphia City Paper* specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on _1 | 7 | 15_

Lillian Swanson

# VERIFICATION

I, Christopher Moraff, have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to me specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on ___1|6|15___

Christopher Moraff

## VERIFICATION

I, Ann Schwartzman, am the Executive Director of the Pennsylvania Prison Society and am authorized to execute this Verification on its behalf. I have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to the Pennsylvania Prison Society specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on 1/6/15

Ann Schwartzman

## VERIFICATION

I, Jean Casella, am Co-Director of Solitary Watch and am authorized to execute this Verification on its behalf. I have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to Solitary Watch specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on ___January 6, 2015___

_____
Jean Casella

## VERIFICATION

I, Professor Regina Austin, have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to me specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on  1/6/2015

Professor Regina Austin

## VERIFICATION

I, Steven Blackburn, have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to me specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on ___1/6/14___

Steven Blackburn

## VERIFICATION

I, Wayne Jacobs, have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to me specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on January 6, 2015

/s/ Wayne Jacobs
Wayne Jacobs

## VERIFICATION

I, Edwin Desamour, have read the foregoing Verified Complain and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to me specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on January 6, 2015

/s/ Edwin Desamour
Edwin Desamour

## VERIFICATION

I, William Cobb, have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury that the facts stated therein that relate to me specifically or that relate to 18 Pa. C.S. § 11.1304 in general are true and correct to the best of my knowledge, information, and belief.

Executed on January 6, 2015

William Cobb

## INDEX OF EXHIBITS

Exhibit

1    Goddard College September 29, 2014 press release entitled, *Mumia Abu-Jamal to Give Commencement Speech at Goddard College*

2    Transcript from Fox News "Kelly File," September 30, 2014 airing of *Widow, college react to convicted cop killer giving commencement speech*

3    Memorandum from Representative Mike Vereb to All House members, dated October 2, 2014, regarding Cosponsor Request – Revictimization Relief Act

4    Transcript of Mumia Abu-Jamal's Goddard College Commencement Speech recorded by Prison Radio, dated October 5th, 2014