## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MUMIA ABU JAMAL**, *et al.*, | : | **CIVIL ACTION NO. 1:14-CV-2148** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KATHLEEN KANE, Attorney** | : | |
| **General of Pennsylvania**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

| | | |
|---|---|---|
| **PRISON LEGAL NEWS**, *et al.*, | : | **CIVIL ACTION NO. 1:15-CV-45** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KATHLEEN KANE, Attorney** | : | |
| **General of Pennsylvania**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the court are two challenges to the Revictimization Act, 18 PA. CONS. STAT. § 11.1304, a 2014 amendment to Pennsylvania's Crime Victims Act, 11 PA. CONS. STAT. §§ 11.101 *et seq.* Plaintiffs attack the constitutionality of Section 11.1304, which authorizes the Commonwealth's Attorney General, district attorneys, and "victims" of personal injury crimes to bring a civil action seeking injunctive and other relief whenever an "offender" engages in any "conduct which perpetuates the continuing effect of the crime on the victim." 18 PA. CONS. STAT. § 11.1304(a)-(b). At the parties' joint request, the court consolidated the above-captioned matters for purposes of resolving various pending motions.

Both plaintiff groups seek preliminary and permanent injunctive relief in addition to a declaratory judgment that the Act is unconstitutional, both facially and as applied to plaintiffs, in violation of the First Amendment to the United States Constitution. Defendants oppose plaintiffs' requests and further move to dismiss both actions for want of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendant R. Seth Williams, District Attorney for Philadelphia County, separately asserts that plaintiffs fail to state a viable claim under Rule 12(b)(6). In this opinion, the court will address defendants' threshold jurisdictional challenges. See Tolan v. United States, 176 F.R.D. 507, 509 (E.D. Pa. 1998) ("[T]he court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot.") (citing In re Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D. Pa. 1993), aff'd 39 F.3d 61 (3d Cir. 1994)).

## I.   __Background__[1]

On October 21, 2014, on a street corner in Philadelphia, Pennsylvania, then-Governor Tom Corbett signed the Revictimization Act, 18 PA. CONS. STAT. § 11.1304, into law. The Act provides, in full:

> (a) ACTION.-- In addition to any other right of action and any other remedy provided by law, a victim of a personal injury crime may bring a civil action against an offender in any court of competent jurisdiction to obtain injunctive and other appropriate relief, including reasonably attorney fees and other costs associated with the litigation, for conduct

---

[1] In accordance with the standard of review for a facial challenge to subject matter jurisdiction, see *infra* Section II, the court will present the facts as alleged in the complaint.

which perpetuates the continuing effect of the crime on the victim.

(b) REDRESS ON BEHALF OF VICTIM.-- The district attorney of the county in which a personal injury crime took place or the Attorney General, after consulting with the district attorney, may institute a civil action against an offender for injunctive or other appropriate relief for conduct which perpetuates the continuing effect of the crime on the victim.

(c) INJUNCTIVE RELIEF.-- Upon a showing of cause for the issuance of injunctive relief, a court may issue special, preliminary, permanent or any other injunctive relief as may be appropriate under this section.

(d) DEFINITION.-- As used in this section, the term "conduct which perpetuates the continuing effect of the crime on the victim" includes conduct which causes a temporary or permanent state of mental anguish.

18 PA. CONS. STAT. § 11.1304.  Neither the Revictimization Act itself nor any other provision of the Crime Victims Act defines the term "offender."  See id.  The Crime Victims Act defines "victim" to include: a direct victim (defined as "[a]n individual against whom a crime has been committed or attempted . . . ."); a parent or legal guardian of a child victim; a minor child who is a material witness to homicide, aggravated assault, or rape committed or attempted against a member of the child's family; and a family member of a homicide victim.  Id. § 11.103.  The term "family member" is further defined to include anyone related to the victim within the third degree of consanguinity, anyone maintaining a common-law relationship with the victim, and any resident of a victim's household, as well as "stepbrothers or stepsisters, stepchildren, stepparents or a fiancé."  Id.

3

The Act's sponsor, State Representative Mike Vereb, introduced the legislation on October 2, 2014, three days after Goddard College—a small liberal arts college in Vermont and plaintiff Mumia Abu-Jamal's *alma mater*—announced its selection of Abu-Jamal as its commencement speaker.  (See <u>PLN</u> Doc. 1 ¶¶ 22, 25; <u>Abu-Jamal</u> Doc. 12 ¶¶ 16, 22-23).[2]  Representative Vereb thereafter circulated a memorandum soliciting co-sponsors for the legislation, stating:

> A convicted murderer is still traumatizing the victim's family and it needs to stop.  We need to ensure this doesn't happen to any other victim or their family . . . .
>
> Officer Faulkner's wife Maureen was left a widow by Abu-Jamal.  But not only did Maureen lose her husband and the life she hoped to lead with him, Maureen also since has been revictimized again and again by Abu-Jamal's ongoing acts.  It is time to put a stop to this, not only for Maureen, but for all victims of personal crimes.

(<u>PLN</u> Doc. 1 ¶ 26).  On October 6, 2014, the House Judiciary Committee convened to discuss the Revictimization Act.  (See <u>id.</u> ¶ 28).  In opening remarks, the Committee Chairman opined that the Act would help eliminate the "extreme distress" suffered by victims and their families, and admonished the College for its "unworthy" and "despicable" decision to "allow a cold-blooded murderer to engage in this conduct." (<u>Id.</u> ¶ 29).  Committee Counsel explained that the Act vests broad discretion in courts presiding over such cases, positing that it may even permit a court "to stop a third party who is the vessel of [offender] conduct or speech from delivering it or publishing that information."  (<u>Id.</u> ¶¶ 32-33).  Encouraging the legislature to pass the

---

[2] Citations to "<u>Abu-Jamal</u> Doc." are to docket entries appearing in <u>Abu-Jamal v. Kane</u>, No. 1:14-CV-2148.  Citations to "<u>PLN</u> Doc." are to docket entries appearing in <u>Prison Legal News v. Kane</u>, No. 1:15-CV-45.

Act, Governor Corbett explained that it would "prevent convicted violent felons from every day revictimizing families and other injured parties by using public venues to promote themselves and their own agenda truly at the emotional expense of the victims and of the public." (Id. ¶ 35).

The Act unanimously passed the State House of Representatives on October 15, 2014, less than two weeks after its introduction. (See id. ¶ 38). The following day, the Senate passed the Act by a 37-11 vote. (Id. ¶ 39). At an October 21 bill-signing ceremony near the intersection where Abu-Jamal's crime of conviction occurred, Governor Corbett championed the Act's ability to enjoin offenders whose speech continues to distress victims. The Governor noted that the Act "is not about any one single criminal," but that it was certainly "inspired by the excesses and hypocrisy of one particular killer," (see Doc. 19-7, Ex. 4 at 1), ostensibly Abu-Jamal. The law took effect immediately. See 2014 Pa. Laws 150, § 2.

On November 10, 2014, twenty days after the Act became law, the Abu-Jamal plaintiffs filed a complaint pursuant to 28 U.S.C. § 1983, asserting that the legislation is an unconstitutional restriction of speech in violation of the First Amendment. (See Abu-Jamal Doc. 1). Plaintiffs filed an amended complaint, joining several additional plaintiffs to the litigation, shortly thereafter. (Abu-Jamal Doc. 12). Plaintiffs in Abu-Jamal are a group of five incarcerated individuals who engage in written and oral human rights advocacy; a California nonprofit organization that broadcasts prisoner recordings online; a Philadelphia nonprofit that advocates on behalf of prisoners; and an unincorporated network of educators who advocate for Abu-Jamal's release. (See Abu-Jamal Doc. 12 ¶¶ 6-13). Together,

the <u>Abu-Jamal</u> plaintiffs assert that the Act is void for vagueness and overbreadth, and is further an impermissible content-based regulation of speech.  They seek declaratory judgment and permanent injunctive relief, in addition to the preliminary injunctive relief sought by motion filed January 8, 2015.  (See <u>Abu-Jamal</u> Doc. 18).

Also on January 8, 2015, plaintiffs in <u>Prison Legal News</u> simultaneously filed a verified complaint and motion for a preliminary injunction.  (See <u>PLN</u> Docs. 1-2). The <u>Prison Legal News</u> plaintiff group comprises various entities and individuals who rely on and publish speech by individuals such as plaintiffs in <u>Abu-Jamal</u>, in addition to five individuals formerly incarcerated for personal injury crimes in Pennsylvania who now engage in a variety of advocacy activities.  (See <u>PLN</u> Doc. 1 ¶¶ 27-150).  In addition to the vagueness, overbreadth, and content-based arguments raised by the <u>Abu-Jamal</u> plaintiffs, the <u>Prison Legal News</u> complaint challenges the Act as an unlawful prior restraint of speech.  (See <u>id.</u> ¶¶ 169-74).

The court consolidated the actions for purposes of resolving the motions for injunctive relief and defendants' anticipated Rule 12 filings.  (See <u>Abu-Jamal</u> Docs. 23, 29; <u>PLN</u> Docs. 10, 21).  On January 23, 2015, the Attorney General and District Attorney Williams moved to dismiss both actions, asserting that the court lacks subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (See <u>Abu-Jamal</u> Docs. 30-31; <u>PLN</u> Docs. 24-25).  On February 26, 2015, the court held oral argument limited to the justiciability concerns raised by defendants.  At the conclusion thereof, the court took defendants' motions under advisement.

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction.  <u>See</u> FED. R. CIV. P. 12(b)(1).  Such jurisdictional challenges take of one two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleadings' factual allegations are untrue, removing the action from the court's jurisdictional ken, <u>see</u> <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977); or (2) they may assert a "facial" challenge, which assumes the veracity of complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction, <u>see</u> <u>Tolan</u>, 176 F.R.D. at 510.  In either instance, it is the plaintiff's burden to establish jurisdiction.  <u>See</u> <u>Mortensen</u>, 549 F.2d at 891 ("[T]he plaintiff will have the burden of proving that jurisdiction does in fact exist.").  Courts should grant a Rule 12(b)(1) motion only when it appears with certainty that assertion of jurisdiction would be improper. <u>See</u> <u>Gould Elecs. Inc. v. United States</u>, 220 F.3d 169, 178 (3d Cir. 2000) ("A claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial or frivolous.'"); <u>see</u> <u>also</u> <u>Tolan</u>, 176 F.R.D. at 510 ("Only if it appears to a certainty that the pleader will not be able to assert a colorable claim of subject matter jurisdiction may the complaint be dismissed.").

## III.   <u>Discussion</u>

Article III, Section 2 of the United States Constitution confers upon the federal courts the power to adjudicate "Cases" and "Controversies."  U.S. CONST. art I, § 2.  As the Supreme Court oft reiterates: "No principle is more fundamental

to the judiciary's proper role in our system of government than th[is] constitutional limitation of federal-court jurisdiction. . . ." Raines v. Byrd, 521 U.S. 811, 818 (1997) (internal quotation marks omitted) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976)).  Absent a case or controversy, the court cannot proceed and must dismiss the action.  See *Ex parte* McCardle, 74 U.S. 506, 514 (1868) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").  Defendants collectively assert a twofold jurisdictional challenge: *first*, they maintain that both plaintiff groups lack standing to challenge the Revictimization Act, and *second*, they assert that the First Amendment constitutional attacks are not ripe for adjudication.  The court will address defendants' contentions *seriatim*.[3]

### A.  Standing

To satisfy the constitutional standing requirement and confer jurisdiction upon the court, plaintiffs must have standing.  See Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982); see also Common Cause of Pa. v. Commw. of Pa., 558 F.3d 249, 258 (3d Cir. 2009) ("[The] case or controversy requirement is satisfied only where a plaintiff has standing.") (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 273 (2008)).  The "irreducible constitutional minimum of standing" requires that a plaintiff establish:

---

[3] The court recognizes that threshold justiciability inquiries into standing and ripeness typically rise or fall together.  See, e.g., Susan B. Anthony List v. Driehaus, ___ U.S. ___, 134 S. Ct. 2334, 2341 n.5 (2014) ("[S]tanding and ripeness issues . . . boil down to the same question.").  Nonetheless, the doctrines operate separately and the court must be mindful of their distinct applications.  See Goudy-Bachman, 764 F. Supp. 2d 684, 692 (M.D. Pa. 2011).

(1) an injury in fact—"an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical' "; (2) "a causal connection between the injury and the complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant;'" and (3) that it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (citations omitted)).  With <u>Lujan</u>'s factors as guideposts, the court must satisfy itself that a litigant has a sufficient "personal stake" in the matter to justify a federal court's exercise of jurisdiction.  <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 493 (2009) (emphasis omitted) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99 (1975)).

In their briefs and at oral argument, each party focused its efforts on the injury in fact requirement.  Defendants assert that, because neither the Attorney General nor District Attorney Williams has enforced the Revictimization Act or expressly threatened its enforcement, no plaintiff can establish that their injury is "actual" or "imminent."  (<u>Abu-Jamal</u> Doc. 36 at 3-12; Doc. 37 at 7-10; <u>PLN</u> Doc. 33 at 3-12; Doc. 34 at 6-9).  Both plaintiff groups concede that the Act has not been enforced and that no plaintiff has been directly threatened with enforcement.  (Tr. 25:10-20, 29:21-30:6).[4]  They contend that, notwithstanding lack of enforcement, the Act presently chills their constitutional right to speak freely on issues of public concern, satisfying the injury in fact requirement.  (<u>See</u> Tr. 25:19-27:7, 30:6-31:8).

---

[4] Citations to "Tr. __ " are to the transcript of the oral argument proceedings convened on February 26, 2015.

In First Amendment litigation, "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13-14 (1972) (citing United Pub. Workers v. Mitchell, 330 U.S. 75, 89 (1947)). It is equally well established, however, that plaintiffs need not await enforcement of a statute before seeking relief in a court of law. See Susan B. Anthony, 134 S. Ct. at 2342 ("When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.") (citing Steffel v. Thompson, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.")).

Rather, in the pre-enforcement context, the injury in fact analysis tasks the court to consider whether a plaintiff has alleged "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by statute, and [3] there exists a credible threat of prosecution thereunder." Susan B. Anthony, 134 S. Ct. at 2342 (internal quotation marks omitted) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)); Planned Parenthood of Ctrl. N.J. v. Farmer, 220 F.3d 127, 148 (3d Cir. 2000) (quoting Babbitt, 442 U.S. at 298). Defendants focus their efforts primarily on a single prong, asserting that neither plaintiff group can establish a credible threat of prosecution under the Act. (See Abu-Jamal Doc. 36 at 3-12; Doc. 37 at 7-10; PLN Doc. 33 at 3-12; Doc. 34 at 6-9). Each party clings to selective—and, in their view, unforgiving—quotation from Supreme Court and Third Circuit Court of Appeals pre-enforcement jurisprudence;

10

the court's analysis, however, is hardly so black and white.  Rather, several factors

gleaned from the extensive body of pre-enforcement case law inform the court's

analysis.  See, e.g., Susan B. Anthony, 134 S. Ct. at 2342-43 (comparing cases).

Before examining the credibility of the threats plaintiffs identify, the court

must first address a threshold issue raised by District Attorney Williams.  In his

opening brief, District Attorney Williams promised not to enforce the Act or take

any action thereunder pending the outcome of this litigation.  (Abu-Jamal Doc. 37 at

9; PLN Doc. 34 at 8).  When plaintiffs challenged the tenuity of this promise, District

Attorney Williams replied by foreswearing *any* enforcement of the Act whatsoever

pending a determination of its constitutionality in a court of competent jurisdiction.

(See Abu-Jamal Doc. 44 at 6; PLN Doc. 46 at 7-8).  For this reason, District Attorney

Williams contends that plaintiffs simply cannot establish a credible threat of

enforcement as to his office.  (Abu-Jamal Doc. 44 at 6; PLN Doc. 46 at 7-8).  This

argument finds much support in the law.  See Salvation Army v. Dep't of Cmty.

Affairs of State of N.J., 919 F.2d 183, 192 (3d Cir. 1990) (declining to "provide an

advisory opinion" when the record reflected "an express assurance that there will

be no enforcement against [plaintiff] of the waived provisions of the statute"); see

also Susan B. Anthony, 134 S. Ct. at 2345 (finding standing when, *inter alia*,

"respondents have not disavowed enforcement if petitioners make similar

statements in the future."); Holder v. Humanitarian Law Project, 561 U.S. 1, 16

(2010) (same, when government had "not argued . . . that plaintiffs will not be

prosecuted if they do what they say they wish to do"); Virginia v. Am. Booksellers

Ass'n Inc., 484 U.S. 383, 393 (1988) (same, when government "has not suggested that

the newly enacted law will not be enforced"); Babbitt, 442 U.S. at 302 (same, when "state has not disavowed any intention of invoking the criminal penalty provision" at issue).[5]  The explicit disavowal of enforcement by District Attorney Williams eliminates any imminent threat of injury as to that defendant and his office.  Hence, the court is compelled to grant District Attorney Williams' Rule 12(b)(6) motion for lack of standing.

The Attorney General offers no such assurance.  Rather, she maintains that there exists no threat "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," Steffel, 415 U.S. at 460, reiterating that no plaintiff has been sued—by her office or otherwise—under the new law.  It is the Attorney General's position that, because the law has not been enforced by anyone in the four months since its enactment, plaintiffs' constitutional claims are foreclosed and nonadjudicable for lack of a credible threat of imminent harm.  (See Abu-Jamal Doc. 33 at 4-6; PLN Doc. 36 at 4-6).  A blend of both precedent and policy considerations requires a contrary finding.

Several cases illustrate the circumstances in which pre-enforcement challengers satisfy Article III standing requirements.  In Virginia v. American Booksellers Ass'n, 484 U.S. 383 (1988), for example, the Supreme Court found a statutory challenge to be justiciable despite a lack of prior threats or a history of enforcement when the law in question was "aimed directly at" the bookseller

---

[5] The Abu-Jamal plaintiffs appeared to agree at oral argument, noting that even when a plaintiff is the direct target of a statute, a defendant can "overcome standing" if they "make an explicit disavowal of any intent to enforce" it.  (See Tr. 28:17-29:7).

plaintiffs.  See id. at 392 ("That [injury in fact] requirement is met here, as the law is aimed directly at plaintiffs . . .") (citing Craig v. Boren, 429 U.S. 190, 194 (1976); Doe. v. Bolton, 410 U.S. 179, 188 (1973)).  Similarly, in Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347 (3d Cir. 2014), the Third Circuit found a pre-enforcement challenge to two portions of the Commonwealth's election code to be justiciable when those provisions "directly regulate[d] the conduct" of the complainants.  Id. at 362 (quoting Lujan, 504 U.S. at 561-62 (holding that "there is little question" in such cases that the law causes the plaintiff an injury)).  By virtue of this precedent, plaintiffs *sub judice* who have been convicted of a personal injury crime have standing to challenge the statute because they are directly in the crosshairs of its prohibitions.  See Am. Booksellers, 484 U.S. at 392 (citing Craig, 429 U.S. at 194; Doe, 410 U.S. at 188); Aichele, 757 F.3d at 362 (quoting Lujan, 504 U.S. at 561-62); see also Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 894 (1983) ("Thus, when an individual who is the very object of a law's requirement or prohibition seeks to challenge it, he always has standing.").

       The Attorney General's failure to foreswear enforcement of this legislation lends further credit to plaintiffs' fears.  The court's finding *supra* that plaintiffs do not have standing as to District Attorney Williams illustrates this:  just as a promise not to enforce the Act eliminates any threat to plaintiffs, the Attorney General's

refusal to do so enhances that threat.[6]  Both the Supreme Court and the Third

Circuit recognize a refusal to disavow enforcement as a relevant consideration in

determining the justiciability of a statutory challenge.  See Susan B. Anthony, 134

S. Ct. at 2345; Humanitarian Law Project, 561 U.S. at 16; Am. Booksellers, 484 U.S.

at 393; Babbitt, 442 U.S. at 302; Planned Parenthood, 220 F.3d at 148.  That threat is

amplified in the instant matter, when the Act authorizes any victim of a personal

injury crime, or any family member of a homicide victim, to file suit.  See Susan B.

Anthony, 134 S. Ct. at 2345 ("The credibility of [a] threat is bolstered by the fact that

authority to file a complaint . . . is not limited to a prosecutor or an agency. . . .").[7]

     The Attorney General maintains that the universe of potential enforcers is

"relatively small," (Tr. 9:8-13), but the Act's broad definition of "family member"—

to include members related to a victim within the third degree of consanguinity,

common law spouses, and even residents of the victim's household—belies this

assertion.  See 18 PA. CONS. STAT. § 11.103.  It is further refuted by plaintiffs'

allegation that the Commonwealth's Victim Advocate has already engaged in "test

---

     [6] Moreover, "in the absence of a controlling decision by a court of competent jurisdiction," Attorney General Kane is compelled to defend the Revictimization Act by Pennsylvania law.  See 71 PA. CONS. STAT. § 732-204(a)(3) ("It shall be the duty of the Attorney General to uphold and defend the constitutionality of all statutes so as to prevent their suspension or abrogation in the absence of a controlling decision by a court of competent jurisdiction.").  For this additional reason, the standing inquiry as to the Attorney General diverges from that applied to District Attorney Williams.

     [7] The court recognizes that Susan B. Anthony involved prior threats against the very plaintiffs in that action and is, to that extent, materially distinct from the instant matter.  Nonetheless, the policy concerns raised by the Court with regard to an expansive universe of potential complainants is equally resonant sub judice, particularly in light of the emotionally charged posture of the potential adversaries in Revictimization Act lawsuits.

14

case" discussions with at least one victim, seeking to enjoin publication of Abu-Jamal's weekly radio commentary and the publication of an upcoming book. (<u>See</u> Doc. 19-7, Ex. 5 at 1-2). Consequently, there exists a "real risk" of an onslaught of complaints filed by individuals who, unlike the Attorney General or district attorneys, "are [not] constrained by explicit guidelines or ethical obligations." <u>Susan B. Anthony</u>, 134 S. Ct. at 2345 (citing <u>Humanitarian Law Project</u>, 561 U.S. at 6).

Of greater concern, the "danger of this statute is, in large measure, one of self-censorship." <u>Am. Booksellers</u>, 484 U.S. at 393. Plaintiffs must immediately alter their conduct if they wish to avoid the statute's threat of a lawsuit, injunction, attorneys' fees, and "other relief." <u>See</u> 18 PA. CONS. STAT. § 11.1304. At least one plaintiff, Kerry Shakaboona Marshall, shelved publication of his memoir, detailing his life as a juvenile offender serving life without parole, for fear of a lawsuit. (<u>See</u> <u>Abu-Jamal</u> Doc. 19-10 ¶ 7). The harm notably extends beyond self-censorship, as third parties have begun denying speaking and publishing opportunities to the offender plaintiffs for fear of enforcement action. (<u>See</u>, <u>e.g.</u>, <u>Abu-Jamal</u> Doc. 19-7 ¶ 15 (Noelle Hanrahan, a producer at Prison Radio, stating that Free Speech Radio News will no longer air Abu-Jamal's weekly commentaries because of the Act). The non-offender plaintiffs assert a related and reciprocal harm: they suffer from the offender plaintiffs' self-censorship, because their advocacy and journalistic endeavors rely on such speech. (<u>See</u>, <u>e.g.</u>, <u>Abu-Jamal</u> Doc. 19-5 ¶ 8 (professor Mark Lewis Taylor stating that he refrained from allowing Abu-Jamal to participate by phone in his classroom discussions); <u>PLN</u> Doc. 1 ¶ 49 (PLN has not yet published

new Abu-Jamal article "due to the threat that the [Revictimization Act] imposes");
see also PLN Doc. 1 ¶ 94-95 (Prison Society will warn its potential contributors of
threats posed by the Act)).  These examples corroborate plaintiffs' subjective fears
of imminent harm.

Regarding the non-offender plaintiffs, the Attorney General suggests that the
definition of "offender" is unequivocal and does not reach third parties.  (See PLN
Doc. 33 at 25-26).  To the extent the Attorney General implies that the non-offender
plaintiffs are without standing to sue for this reason alone, the court disagrees.  The
Attorney general's position ignores a principle oft-emphasized by the Supreme
Court, *to wit*:  in the unique context of First Amendment challenges, litigants need
not establish concrete *individual* harm to satisfy Article III's case or controversy
requirement.  See, e.g., Sec'y of State of Md. v. J.H. Munson Co., 467 U.S. 947, 956-
57 (1984) ("Litigants . . . are permitted to challenge a statute not because their own
rights of free expression are violated, but because . . . the statute's very existence
may cause others not before the court to refrain from constitutionally protected
speech or expression.") (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973)).

The Attorney General lastly argues that, because a judge must ultimately
determine whether to impose the prospective injunctive relief contemplated by the
Act, any injury cited by plaintiffs is necessarily attenuated.  The Attorney General is
correct to the extent that the statute is not self-executing; any victim seeking relief
thereunder must apply to a judge "in a court of competent jurisdiction" to seek
relief.  See 18 PA. CONS. STAT. § 11.1304(a).  Nonetheless, the statute authorizes
claims for injunctive and other relief against the plaintiffs, and its boundaries and

manner of execution are, at this juncture, unclear.  See id.  Moreover, even if a

victim is unsuccessful in obtaining injunctive relief, the offender must defend a

lawsuit and faces a potential assessment of attorneys' fees in connection with any

Section 11.1304 action, regardless of whether he or she prevails on the merits.  See

id.  The Supreme Court and Third Circuit both have found standing in pre-

enforcement fundamental rights cases despite the fact that the ultimate penalty

feared by plaintiffs is left to the discretion of a third party.  See, e.g., Susan B.

Anthony, 134 S. Ct. at 2338-39 (statute vesting authority in election commission to

assess costs upon application of "any person"); Aichele, 757 F.3d at 362-63 (statute

permitting a court to assess costs "as that court deems just" upon application of

private actors (internal quotation marks omitted)).  This court similarly rejects the

Attorney General's argument that judicial oversight as to the injunctive element of

the statute eliminates plaintiffs' standing to sue.

　　　In the matter before the court, plaintiffs are the explicit object of the new

legislation.  They have alleged real and reasonable fears that the legislation will be

enforced against them in the immediate future, and the Attorney General has not

expressly or impliedly indicated that she will not enforce it.  Cf. Am. Booksellers,

484 U.S. at 393 (finding standing absent historical enforcement or express threats

when state did not disavow the legislation and plaintiffs established credible fear of

imminent prosecution); Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1300 (3d Cir.

1996) (summarily finding standing when the challenged regulation "is directed at"

plaintiffs and exposed them to strong sanctions for noncompliance) (quoting Abbott

Labs. v. Gardner, 387 U.S. 136, 154 (1967), overruled on other grounds, Califano v.

Sanders, 430 U.S. 99, 104 (1977)).  For all of these reasons, the court is "not troubled

by the pre-enforcement nature of this suit," Am. Booksellers, 484 U.S. at 393, and

finds that both plaintiff groups have standing to maintain this action.

     **B.**    **Ripeness**

     The determination of standing, however, does not end the court's Article III

case or controversy inquiry.  Both plaintiff groups must also satisfy the justiciability

doctrine of ripeness.  This inquiry examines whether the claim itself is sufficiently

mature and properly adjudicable.  See Peachlum v. City of York, 333 F.3d 429, 433

(3d Cir. 2003) (citing Abbott Labs., 387 U.S. at 148-49; Phila. Fed. of Teachers, Am.

Fed. of Teachers, Local 3, AFL-CIO v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998)).  Two

fundamental considerations govern a ripeness analysis:  (1) "the fitness of the issues

for judicial decision," and (2) "the hardship to the parties of withholding court

consideration."  Abbott Labs., 398 U.S. at 149.  In the pre-enforcement context,

these considerations dictate that: (1) the parties have sufficiently adverse legal

interests; (2) the facts are sufficiently concrete to allow for conclusive legal

judgment; and (3) the judgment has utility, or renders practical help to the parties.

See Peachlum, 333 F.3d at 435 (citing Step-Saver Data Sys., Inc. v. Wyse Tech., 912

F.2d 643, 647 (3d Cir. 1990)).

     The Attorney General's ripeness argument parallels her standing position:

she contends that both plaintiff groups' claims are unripe and non-justiciable

because they rely on contingent future events.  (See Abu-Jamal Doc. 36 at 8-12;

PLN Doc. 33 at 8-12).  It follows, the Attorney General argues, that the parties are

not adverse, and the issues are not sufficiently concrete, because plaintiffs face no

immediate harm or hardship until and unless the Act is enforced against them. (See Abu-Jamal Doc. 36 at 8-12; PLN Doc. 33 at 8-12).  The Attorney General's ripeness argument suffers the same maladies as her standing position.

First Amendment facial overbreadth challenges are "subject to a relaxed ripeness standard." Peachlum, 333 F.3d at 434 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002)).  Indeed, ripeness inquiries are at their "*most* relaxed" in this context. Id. at 438 (emphasis added) (citing Kines v. Day, 754 F.2d 28, 30-31 (3d Cir. 1985)).  This modified burden is critical in free speech litigation, because "unconstitutional statutes . . . tend to chill protected expression among those who forbear speaking *because of the law's very existence*." Id. at 434-45 (emphasis added) (citing Broadrick, 413 U.S. at 612; 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE  § 3532.5 (2d ed. 1984)).  Thus, when pre-enforcement challenges hinge principally on questions of law, a court may render conclusive determinations, assuming satisfaction of Article III standing requirements.  Goudy-Bachman, 764 F. Supp. 2d at 693 (citing Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66, 580 F.3d 185, 191 (3d Cir. 2009)).  Such is the case *sub judice*.

Plaintiffs are the admitted objects of the Revictimization Act, and the Attorney General is authorized to use the Act against them in court.  She has not disavowed an intent to enforce the legislation, and for this reason, the parties are sufficiently adverse for ripeness purposes.  Moreover, neither party suggests that a more developed factual record will better inform the court's resolution of plaintiffs'

constitutional challenges.  See, e.g., Goudy-Bachman, 764 F. Supp. 2d at 693-94

(holding that pre-enforcement plaintiffs had standing to challenge the individual

mandate of the Affordable Care Act despite the fact that the mandate was not yet

effective when the case commenced) (citing Pic-A-State Pa., 76 F.3d at 1300.  As the

Third Circuit routinely observes:  in "cases involving fundamental rights, *even the

remotest threat of prosecution*, such as the absence of a promise not to prosecute, has

supported a holding of ripeness" when the central issues are "predominantly legal"

and do "not require additional factual development."  Peachlum, 333 F.3d at 435

(internal quotations omitted) (quoting Presbytery of N.J. of Orthodox Presbyterian

Church v. Florio, 40 F.3d 1454, 1464 (3d Cir. 1994)).

Further, a decision on the constitutionality of the statute would have broad

and immediate utility, not only to the parties before the court but to offenders and

potential third parties across the Commonwealth whose expression, according to

plaintiffs, is currently chilled by the Act's existence.  See, e.g., Pic-A-State, 76 F.3d

at 1300 (finding definite utility in judgment that would permit plaintiff to "promptly

resume its activities").  In light of the foregoing, and the court's determination on

standing, the instant dispute is ripe for adjudication.

**IV.     Conclusion**

The court is satisfied that jurisdiction is proper as to the Attorney General, but will dismiss this action as to District Attorney Williams.  An order resolving defendants' respective Rule 12(b)(1) motions and charting the course for further proceedings shall issue.

                                                  /S/ CHRISTOPHER C. CONNER
                                                  Christopher C. Conner, Chief Judge
                                                  United States District Court
                                                  Middle District of Pennsylvania

Dated:          March 6, 2015