### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MUMIA ABU JAMAL**, *et al.*, | : | **CIVIL ACTION NO. 1:14-CV-2148** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KATHLEEN KANE, Attorney** | : | |
| **General of Pennsylvania,** | : | |
| | : | |
| **Defendant** | : | |

---

| | | |
|---|---|---|
| **PRISON LEGAL NEWS**, *et al.*, | : | **CIVIL ACTION NO. 1:15-CV-45** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **KATHLEEN KANE, Attorney** | : | |
| **General of Pennsylvania,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

The case at bar presents a constitutional challenge to a state statute.  The disputed enactment creates a right of action to enjoin the expressive conduct of violent criminals that causes mental anguish to victims or their families.  Significantly, however, the fact that certain plaintiffs have been convicted of infamous or violent crimes is largely irrelevant to our First Amendment analysis.  A past criminal offense does not extinguish the offender's constitutional right to free expression.  The First Amendment does not evanesce at the prison gate, and its enduring guarantee of freedom of speech subsumes the right to expressive conduct that some may find offensive.

The court concludes that the challenged statute betrays several constitutional requirements; the enactment is unlawfully purposed, vaguely executed, and patently overbroad in scope.  However well-intentioned its legislative efforts, the General Assembly fell woefully short of the mark.  The result is a law that is manifestly unconstitutional, both facially and as applied to plaintiffs.  Thus, the court is compelled to grant plaintiffs' requests for declaratory relief, declare the Revictimization Relief Act, 18 PA. CONS. STAT. § 11.1304, to be violative of the First and Fifth Amendments to the United States Constitution, and permanently enjoin its enforcement.

## I.   Background[1]

Before the court are two challenges to the Revictimization Relief Act, a 2014 amendment to Pennsylvania's Crime Victims Act, 18 PA. CONS. STAT. §§ 11.101 *et seq.*  Plaintiffs attack the constitutionality of section 11.1304, which authorizes the Commonwealth's Attorney General, district attorneys, and "victims" of personal injury crimes to bring a civil action to obtain injunctive relief when an "offender" engages in "conduct which perpetuates the continuing effect of the crime on the victim." 18 PA. CONS. STAT. § 11.1304(a)-(b).  Both plaintiff groups seek preliminary and permanent injunctive relief as well as a declaratory judgment that the Act violates the First and Fifth Amendments to the Constitution.

---

[1] The court will summarize the relevant factual background and procedural history herein.  A more detailed account is set forth in the court's memorandum (Doc. 47) dated March 6, 2015, familiarity with which is presumed.

The full text of the Act provides:

> (a) ACTION.-- In addition to any other right of action and any other remedy provided by law, a victim of a personal injury crime may bring a civil action against an offender in any court of competent jurisdiction to obtain injunctive and other appropriate relief, including reasonable attorney fees and other costs associated with the litigation, for conduct which perpetuates the continuing effect of the crime on the victim.

> (b) REDRESS ON BEHALF OF VICTIM.-- The district attorney of the county in which a personal injury crime took place or the Attorney General, after consulting with the district attorney, may institute a civil action against an offender for injunctive or other appropriate relief for conduct which perpetuates the continuing effect of the crime on the victim.

> (c) INJUNCTIVE RELIEF.-- Upon a showing of cause for the issuance of injunctive relief, a court may issue special, preliminary, permanent or any other injunctive relief as may be appropriate under this section.

> (d) DEFINITION.-- As used in this section, the term "conduct which perpetuates the continuing effect of the crime on the victim" includes conduct which causes a temporary or permanent state of mental anguish.

18 PA. CONS. STAT. § 11.1304.  The Act's sponsor, State Representative Mike Vereb, announced the bill on October 2, 2014, just three days after Goddard College—a small liberal arts college in Vermont and plaintiff Mumia Abu-Jamal's *alma mater*—announced its selection of Abu-Jamal as its commencement speaker.  (See Joint Stip. ¶¶ 1-2).[2]  His cosponsor memorandum admonished an unidentified "convicted killer" for "traumatizing the victim's family."  (Id. Ex. 2).  The Act passed both

---

[2] Citations to "Joint Stip." are to the joint stipulation of facts and exhibits submitted by the parties on March 23, 2015.  (Abu-Jamal Doc. 49; PLN Doc. 52).

chambers of the General Assembly in less than two weeks' time, unaltered from its original form.  (See id. ¶¶ 6-7, 11).

During an October 21 bill-signing event near the intersection where Abu-Jamal's crime of conviction occurred, then-Governor Tom Corbett lauded the Act for its ability to enjoin offenders whose speech distresses victims.  The Governor noted that the Act "is not about any one single criminal" but was "inspired by the excesses and hypocrisy of one particular killer," (id. Ex. 7 at 1), transparently referencing Abu-Jamal.  John Rafferty, a sponsoring senator, championed the Act as a means to prohibit "these rascals, these bad people from becoming entertainment values here in the Commonwealth of Pennsylvania."  (Id. at 3).  The law took effect immediately.  See 2014 Pa. Laws 150, § 2.

Twenty days after the Act became law, the Abu-Jamal plaintiffs filed a complaint under 28 U.S.C. § 1983 naming Kathleen Kane, Attorney General of Pennsylvania, and R. Seth Williams, District Attorney for Philadelphia County, as defendants.  (See Abu-Jamal Doc. 1).[3]  Plaintiffs later amended their complaint to include several additional challengers.  (See Abu-Jamal Doc. 12).  The Prison Legal News plaintiffs followed suit shortly thereafter.  (See PLN Doc. 1).  Collectively, the plaintiff groups assert that the Act is impermissibly vague, substantially overbroad, and an unlawful, content-based regulation of speech.  (See Abu-Jamal Doc. 12; PLN Doc. 1).  The Prison Legal News plaintiffs also label the Act an unconstitutional prior restraint of speech.  (See PLN Doc. 1 ¶¶ 169-74).

---

[3] Citations to "Abu-Jamal Doc." are to docket entries appearing in Abu-Jamal v. Kane, No. 1:14-CV-2148.  Citations to "PLN Doc." are to docket entries appearing in Prison Legal News v. Kane, No. 1:15-CV-45.

The court consolidated the actions for purposes of resolving plaintiffs' requests for preliminary injunctive relief and defendants' Rule 12 motions. (See Abu-Jamal Docs. 23, 29; PLN Docs. 10, 21).  On January 23, 2015, both defendants moved to dismiss plaintiffs' claims, asserting that the court lacks subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (See Abu-Jamal Docs. 30-31; PLN Docs. 24-25).  Defendants argued that, because neither defendant has enforced the Act, no plaintiff can establish harm, or an imminent threat thereof, flowing from the legislation.  (See Abu-Jamal Docs. 30-31; PLN Docs. 24-25).  The court held argument limited to justiciability concerns on February 26, 2015, and thereafter issued a memorandum opinion resolving both Rule 12 motions.  See Abu-Jamal v. Kane, No. 1:14-CV-2148, 2015 WL 999194 (M.D. Pa. Mar. 6, 2015).  The court dismissed the District Attorney, finding that his guarantee to refrain from enforcement of the Act pending review of its constitutionality eliminated any threat of injury as to his office.  See id. at *6.  With regard to the Attorney General, the court concluded that both groups established standing given her office's refusal to disavow enforcement of the Act and the immediate self-censorship resulting therefrom.  See id. at *6-8.

The court consolidated trial on the merits with the preliminary injunction hearing, (Doc. 48 ¶ 4), holding a bench trial and oral argument on March 30, 2015.  At the conclusion thereof, the court took plaintiffs' requests under advisement.

## II.   **Standard of Review**

Federal Rule of Civil Procedure 65 permits a district court to consolidate a preliminary injunction hearing with trial on the merits when appropriate.  FED. R.

CIV. P. 65(a)(2) ("Before or after beginning a hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing.").  In deciding whether permanent injunctive relief should issue, the court must first determine "if the plaintiff has actually succeeded on the merits."  Pa. Pride, Inc. v. Southampton Twp., 78 F. Supp. 2d 359, 361 (M.D. Pa. 1999) (quoting Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc., 747 F.2d 844, 850 (3d Cir. 1984)).  This inquiry tasks the court to determine whether a plaintiff has "met its burden of proof."  Ciba-Geigy Corp., 747 F.2d at 850 (citing Evans v. Buchanan, 555 F.2d 373 (3d Cir. 1977)).  The parties agree that no genuine disputes of material fact remain and that the question before the court is purely one of law.  Accordingly, the court will treat plaintiffs' pending applications as motions for summary judgment.  See FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); see also Krebs v. Rutgers, 797 F. Supp. 1246, 1252-53 (D.N.J. 1992) (applying Rule 56 to injunctive relief application when parties agreed that remaining merits issue "involve[d] consideration of a pure point of law").

### III.  **Undisputed Facts**[4]

Plaintiffs *sub judice* represent two distinct but allied groups.  The Abu-Jamal plaintiffs include five inmates, each of whom has been convicted of and is presently incarcerated for committing a personal injury crime in Pennsylvania.  (See Doc. 49 ¶¶ 15, 31, 40, 48, 58).  These prisoners frequently engage in written and oral

---

[4] The above statement of undisputed facts derives from the parties' joint stipulation of facts, which the court adopts in full.

commentary, advocacy, and educational endeavors on a variety of topics of public concern.  (See id. ¶¶ 15-22, 31-37, 41-44, 49-54, 59-61).  The Abu-Jamal plaintiffs also include Prison Radio, Human Rights Coalition ("HRC"), and Educators for Mumia Abu-Jamal ("EMAJ"), three entities which regularly publish inmate plaintiffs' speech.  (See id. ¶¶ 64, 75-77, 86-92).  Prison Radio produces prisoner commentary "aired on hundreds of radio and television stations every week."  (Id. ¶¶ 64-71). HRC is an incorporated advocacy group, comprising prisoners' families, former and current prisoners, and activists.  (See id. ¶¶ 75-76).  It publishes *The Movement*, a magazine that features correspondence and articles by prisoners regarding legal, political, human rights, and other issues of public interest.  (See id. ¶¶ 77-78).  EMAJ is an unincorporated network of educators who feature correspondence from and telephonic discussions with Abu-Jamal in their classes.  (Id. ¶¶ 86-90).

The Prison Legal News plaintiffs, by contrast, are individuals and entities who rely on inmate speech in their work.  Plaintiffs *Prison Legal News* ("PLN"), the *Philadelphia City Paper*, Pennsylvania Prison Society ("PPS"), and Solitary Watch are publications and organizations that publish prisoner speech to convey information of public concern.  (See id. ¶¶ 96-97, 141-42, 150-52).  Daniel Denvir is a journalist for the *Philadelphia City Paper*, and Christopher Moraff is a freelance journalist whose work has appeared in nonparty publications such as *The Philadelphia Inquirer*, *The Daily Beast*, and others.  (Id. ¶ 104).  Both journalists have devoted their careers to covering wide-ranging criminal justice issues and believe the Act may apply to their work.  (Id. ¶¶ 105-11, 128-32).  Professor Regina Austin similarly fears that the Act applies to video testimonials she creates in support of

clemency applications for Pennsylvania prisoners.  (Id. ¶¶ 160-64).  Steven

Blackburn, Wayne Jacobs, Edwin Desamour, and William Cobb are former

Pennsylvania prisoners who engage in public speaking and advocacy work with the

goals of, *inter alia*, encouraging at-risk youth to avoid a life of crime, decreasing

recidivism, and assisting with reintegration into society.  (See id. ¶¶ 169-73, 178-83,

188-92, 197-203).

Since its passage, the Revictimization Act has had an undeniable chilling

effect on the speech of prisoners and on the behavior of those individuals and

entities who rely on that speech.  Although several plaintiffs have continued their

respective endeavors without restraint or repercussion, (see id. ¶¶ 26-27, 30, 35-36,

39), some have limited their commentaries or been denied publication for fear of the

Act's enforcement.  For example, nonparty Free Speech Radio News ceased widely

publishing Abu-Jamal's weekly commentaries on the radio.  (See id. ¶¶ 23-25).

Kerry Shakaboona Marshall ("Marshall") shelved publication of his book, a memoir

of his experiences as a juvenile serving life in prison without parole.  (See id. ¶ 37).

Anthony Chance ("Chance") will publish under a pseudonym, in an effort to avoid

the Act's scope.  (Id. ¶ 61).  Prison Radio, HRC, and EMAJ have continued their

work without incident, but at least one member of EMAJ was delayed in presenting

Abu-Jamal to his class pending review of the Act by seminary counsel.  (Id. ¶¶ 91-

92).  PLN withheld publication of an article authored by Abu-Jamal, (id. ¶ 98), and

PPS published a warning in its "Graterfriends" newsletter admonishing potential

authors of the new risk attendant to prisoner publications.  (Id. ¶ 147).  The parties

agree that, subjective chill notwithstanding, the Act has yet to be enforced.  (See id. ¶ 13).

## IV.   Discussion

Plaintiffs assert three principal challenges: *first*, that the Act is a content-based regulation of speech unjustified by compelling government interests; *second*, that it is impermissibly vague; and *third*, that it is substantially overbroad, all in violation of the United States Constitution.  Each challenge is meritorious.

### A.   The Revictimization Relief Act Impermissibly Regulates Speech Based On Content

Legislation restricting expression based on content is inherently suspect.  As a consequence, such enactments demand the highest level of judicial scrutiny.  See United States v. Alvarez, 132 S. Ct. 2537, 2543 (2012) (quoting Ashcroft v. ACLU, 535 U.S. 564, 573 (2002)); see also Regan v. Time, Inc., 468 U.S. 641, 648-49 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.").  Indeed, the "high purpose" of the Constitution's leading amendment is to protect even that content which an audience might find unpleasant.  See Coleman v. Gettysburg Coll., 335 F. Supp. 2d 586, 589 (M.D. Pa. 2004) ("[Free speech] may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." (quoting Texas v. Johnson, 491 U.S. 397, 408-09 (1989))).  Absent a compelling governmental purpose, the state may not react with interdiction based solely on disagreement with an expression. See Alvarez, 132 S. Ct. at 2543; Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55-56

(1988); <u>Members of City Council of L.A. v. Taxpayers for Vincent</u>, 466 U.S. 789, 804

(1984); <u>Carey v. Brown</u>, 447 U.S. 455, 462-63 (1980).

From these principles derives a corollary that has become the hallmark of

First Amendment jurisprudence: the government may not proscribe speech based

exclusively on its potential to offend.  <u>See</u> <u>Johnson</u>, 491 U.S. at 414 (identifying same

as the "bedrock principle" of the First Amendment (citing <u>Hustler Magazine</u>, 485

U.S. at 55-56; <u>Taxpayers for Vincent</u>, 466 U.S. at 804; <u>Carey</u>, 447 U.S. at 462-463;

<u>Buckley v. Valeo</u>, 424 U.S. 1, 16-17 (1976); <u>Police Dep't of Chi. v. Mosley</u>, 408 U.S. 92,

95 (1972); <u>United States v. O'Brien</u>, 391 U.S. 367, 382 (1968))).  In other words, our

Constitution prohibits the state from reacting to the emotive response of a few

individuals with enactments that place arbitrary limits upon free expression.  <u>See,</u>

<u>e.g.</u>, <u>Alvarez</u>, 132 S. Ct. at 2551; <u>United States v. Playboy Entm't Grp.</u>, 529 U.S. 803,

813 (2000); <u>R.A.V. v. City of St. Paul, Minn.</u>, 505 U.S. 377, 390-91 (1992); <u>Forsyth</u>

<u>Cnty. v. The Nationalist Movement</u>, 505 U.S. 123, 134-35 (1992); <u>Johnson</u>, 491 U.S. at

414; <u>Boos v. Barry</u>, 485 U.S. 312, 322 (1988); <u>Cohen v. California</u>, 403 U.S. 15, 21

(1971); <u>United States v. Marcavage</u>, 609 F.3d 264, 282 (3d Cir. 2010); <u>see</u> <u>also</u>

<u>Coleman</u>, 335 F. Supp. at 589 ("Offense to the few is the repercussion of freedom for

all.").  Even when a court discerns from speech "nothing of any possible value to

society," it must nonetheless accord that expression the same protections granted to

the Nation's most prized literature.  <u>Brown v. Entm't Merchs. Ass'n</u>, 131 S. Ct. 2729,

2737 n.4 (2011) (quoting <u>Winters v. New York</u>, 333 U.S. 507, 510 (1948)).

The Attorney General does not deny these cornerstones of First Amendment

jurisprudence.  Instead, she denounces plaintiffs' characterization of the statute as a

10

regulation of expression, describing it instead as a limitation of certain "behavior." The Attorney General argues that the law's primary goal is to eliminate "taunting" or "harassing" behavior toward victims. (See Abu-Jamal Doc. 36 at 22; PLN Doc. 33 at 22). She emphasizes the statute's use of the term "conduct" and dismisses any First Amendment infringement as "incidental" to this broader purpose. (See Abu-Jamal Doc. 36 at 16; PLN Doc. 33 at 16). It follows, she argues, that the Act commands a less exacting degree of constitutional scrutiny. See O'Brien, 391 U.S. at 376-77 (noting that courts tolerate "incidental limitations on First Amendment freedoms" when an "important government interest" justifies broader prohibitions of conduct with " 'speech' and 'nonspeech' elements").

The Act itself contains no restrictive language supporting the construction urged by the Attorney General.[5] *In toto*, the Act comprises four sentences, none of which limits the parameters of the statute as a whole. See 18 PA. CONS. STAT. § 11.1304. Nor does the Act's legislative history reinforce the Attorney General's interpretation. No supporter spoke of an intent to prevent a convicted rapist from "crank calling" his victim, or a convicted kidnapper from standing outside of her victim's home for hours on end. (See, e.g., Joint Stip. Exs. 2, 4, 5, 6, 7). Indeed, throughout its brief legislative gestation, the law was championed *primarily* as a device for suppressing offender speech. (See id.) The Act's sponsor extolled its capacity to silence Abu-Jamal in particular. (See id. Ex. 2 at 1). The chairman of the house judiciary committee opined that the Act would end the "extreme distress"

---

[5] In fact, during oral argument, the Attorney General made numerous concessions which broadened, rather than narrowed, the scope of the Act. These concerns guide the court's overbreadth and vagueness analysis *infra*.

suffered by victims when offenders achieve celebrity, admonishing Goddard College for providing a "cold blooded murderer" with a speaking forum. (See id. Ex. 4 at 1). Senator Rafferty praised the Act for creating a remedy "when the perpetrator of the crime is getting attention that [the victim] may feel is not warranted." (Id. Ex. 6 at 1). And Governor Corbett commended the legislature for expeditiously passing a law that quells the "obscene celebrity" of an "unrepentant cop killer." (Id. Ex. 7 at 1).

The Act's remedy clearly reflects an intent to inhibit expression based exclusively on content—in particular, the impact that content has on a listener, reader, or other recipient. See TBS, Inc. v. FCC, 512 U.S. 622, 642 (1994) (observing that "the mere assertion of a content-neutral purpose" will not "be enough to save a law which, on its face, discriminates based on content"). The Act permits enjoinder of offender speech based entirely on its effect on a victim. See 18 Pa. Cons. Stat. § 11.1304. In this regard, the Supreme Court is unequivocal: a legislative proscription conditioned upon the impact an expression has on its listeners "is the essence of content-based regulation." Playboy Entm't Gr., 529 U.S. at 811-12; see also Forsyth Cnty., 505 U.S. at 134 (holding that "[l]isteners' reaction to speech is not a content-neutral basis for regulation"); Boos, 485 U.S. at 321 (concluding that prohibition premised on "the direct impact that speech has on its listeners . . . must be considered content-based").

The Revictimization Relief Act is the embodiment of a content-based regulation of speech. Its terms single out a distinct group and disincentivize its members from speaking. A cursory reading of the Act, coupled with its legislative

history, reveals a principal purpose of restricting expressive activity based on content.  See 18 PA. CONS. STAT. § 11.1304.  As applied to plaintiffs *sub judice*, the Act has the nearly exclusive effect of deterring public expression.  (E.g., Joint Stip. ¶¶ 23-25, 37, 61, 91-92, 98, 147).  Strict constitutional scrutiny thus governs the court's review of this content-based legislation.[6]  See Alvarez, 132 S. Ct. at 2543 (quoting Ashcroft, 535 U.S. at 573); Brown, 131 S. Ct. at 2738-39 (citing R.A.V., 505 U.S. at 395); Carey, 447 U.S. at 461-62 (citing Mosley, 408 U.S. at 98-99).

The Revictimization Act instantly fails the "exacting scrutiny" applied to such restrictions.  See Alvarez, 132 S. Ct. at 2548.  The Supreme Court unfailingly rebukes attempts to censure speech based solely on its potential to hurt, disgust, or offend.  See, e.g., R.A.V., 505 U.S. at 414; Johnson, 491 U.S. at 414; Boos, 485 U.S. at 321; Hustler Magazine, 485 U.S. at 55.  As the Court observed recently in Snyder v. Phelps, __ U.S. __, 131 S. Ct. 1207 (2013), the First Amendment demands tolerance of "even hurtful speech" so that "we do not stifle public debate."  Snyder, 131 S. Ct. at 1220.

For this reason, the Court flatly rejected revictimization as a basis for restricting expression more than twenty years ago.  In Simon & Schuster, Inc. v.

---

[6] Assuming *arguendo* that the Act or its history revealed a principal intention to regulate behavior and only an incidental regulation of speech, the court's holding would remain unaltered.  The Supreme Court has held that when a law "*generally* functions as a regulation of conduct" it is nonetheless subject to strict scrutiny when "as applied to plaintiffs[,] the conduct triggering coverage under the statute consists of communicating a message."  Holder v. Humanitarian Law Project, 561 U.S. 1, 27-28 (2012) (citing Cohen, 403 U.S. at 16-19).  Here, the principal effect of the statute as applied to plaintiffs is the stifling of expression.  (E.g., Joint Stip. ¶¶ 23-25, 37, 61, 91-92, 98, 147).  Strict scrutiny thus controls notwithstanding the Attorney General's tenuous assertion that the Act principally regulates "conduct."  See Holder, 561 U.S. at 27-28; Cohen, 403 U.S. at 16-19.

Members of the N.Y. State Crime Victims Bd., 502 U.S. 105 (1991), the state of New York sought to redirect profits from published works depicting crimes into escrow accounts payable to crime victims as recompense for pain and suffering. See id. at 108-11. The Court held that the statute was clearly content-based and, as such, subject to strict scrutiny. Id. at 115-16. The Court immediately dismissed any state interest in shielding crime victims from such speech. See id. (quoting United States v. Eichman, 496 U.S. 310, 319 (1990)). Relevant herein, the Court observed that a state cannot restrict expression in order to limit "whatever mental anguish . . . victims may suffer from reliving their victimization." Id. at 118 (quoting Hustler Magazine, 485 U.S. at 55; Eichman, 496 U.S. at 319).[7]

In the Revictimization Act, the Commonwealth articulates that which the state of New York in Simon & Schuster did not—an *explicit* intent to enjoin expression that causes mental anguish in crime victims. Compare 18 PA. CONS. STAT. § 11.1304 ("*Revictimization* Relief Act" (emphasis added)), with Simon & Schuster, 502 U.S. at 118 ("The [state] disclaims, as it must, any interest in suppressing descriptions of crime out of solicitude for the sensibilities of readers."). Simon & Schuster, in conjunction with decades of Supreme Court precedent, seals the Act's fate. Even the noblest governmental intentions cannot cure impermissible legislation when the United States Supreme Court has explicitly foreclosed the

---

[7] The court ultimately held that states do have a compelling interest in compensating victims, but found that the statute was not narrowly tailored to accomplish that interest. See Simon & Schuster, 502 U.S. at 118-22. Specifically, the Court found the statute to be "overinclusive," encompassing in its scope "works on *any* subject . . . however tangentially or incidentally" related to a crime, and by any author who admits to a crime in their work, whether or not the author was ever accused or convicted. Id. at 121.

14

legislation's purpose.  See Simon & Schuster, 502 U.S. at 118; see also Snyder, 131 S. Ct. at 1218 (holding that even when expression "inflict[s] great pain . . . we cannot react . . . by punishing the speaker").  Hence, the court must strike the Revictimization Relief Act for its impermissible infringement on the constitutional guarantee of free expression.

**B.   The Revictimization Relief Act Is Also Impermissibly Vague and Substantially Overbroad**

Vagueness and overbreadth concerns compound the Act's constitutional infirmities.  The vagueness doctrine is borne of the Due Process Clause of the Fifth Amendment.  See United States v. Williams, 553 U.S. 285, 304 (2008) ("Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment.").  It requires the government to advise precisely what conduct is impacted so that the public may tailor its behavior accordingly. See Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1982).  Legislation falls short of this mandate when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited."  FCC v. Fox TV Stations, Inc., __ U.S. __, 132 S. Ct. 2307, 2317 (2012) (citing Williams, 553 U.S. at 304); see also Vill. of Hoffman Estates, 455 U.S. at 498.  When free speech is implicated, the Constitution demands "rigorous adherence" to these due process requirements.  FCC, 132 S. Ct. at 2317.

Overbreadth concerns, by contrast, arise when a statute restricts more conduct than is necessary to accomplish its legitimate purpose.  The Supreme Court has long held that courts may invalidate legislation restricting free speech

when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, n.6 (2008)) (internal quotation marks omitted); see also Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 (1975) ("This Court has long recognized that a demonstrably overbroad statute or ordinance may deter the legitimate exercise of First Amendment rights.").[8]  In the free speech context, a statute is substantially overbroad if "it is unclear whether it regulates a substantial amount of protected speech." Williams, 553 U.S. at 304 (citing Reno v. ACLU, 521 U.S. 844, 870-74 (1997); Vill. of Hoffman Estates, 455 U.S. at 494-95 & nn. 6-7).  The Revictimization Act implicates—and violates—both doctrines.

The Act is impermissibly vague in its wholesale lack of definition.  As a threshold matter, the statute does not define the term "offender," see 18 PA. CONS. STAT. § 11.1304(a), such that the public cannot know *whose* conduct it regulates. During a legislative judiciary committee meeting, committee counsel opined that the term permits a broad construction to include non-offender third parties who

---

[8] The Attorney General cites United States v. Salerno, 481 U.S. 739 (1987), in her opposition brief, asserting that the overbreadth standard requires plaintiffs to demonstrate that "no set of circumstances exist under which" the Act might be constitutionally applied.  (Abu-Jamal Doc. 36 at 15-16; PLN Doc. 33 at 15-16 (noting alternatively that the Supreme Court has "suggested" that the standard "may be" lower)).  The Attorney General abandoned this position during oral argument, focusing exclusively on the less rigorous standard cited by plaintiffs.  (See Tr. 42:12-25).  Her earlier contention is foreclosed by Supreme Court precedent, which expressly adopts a lighter standard of overbreadth review in free speech cases.  See Stevens, 559 U.S. at 473 ("In the First Amendment context . . . this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' ").

publish offender speech.  (See Joint Stip. Ex. 4 at 3 (describing potential liability for a "vessel" of speech)).  The Attorney General suggests that the term includes even persons who are accused but not yet convicted.  (See Tr. 45:7-47:23).[9]  It is thus unclear whether an offender includes the accused, the convicted, the exonerated, third parties, or all of the foregoing.  As a result, many plaintiffs—prisoners and non-prisoners alike—instantly modified their conduct for fear of falling within the ambit of the Act.  (See id. ¶¶ 23-25, 37, 61, 91-92, 98, 147).

The Act's primary barometer of actionable expressive activity is equally vague.  It refers only to "conduct" that causes "a temporary or permanent state of mental anguish," 18 PA. CONS. STAT. § 11.1304, but offers no guidance to state courts in determining whether a plaintiff is entitled to relief.  It does not specify whether reactions to speech will be measured by an objective or subjective standard, or what level of "anguish" will suffice.  See, e.g., Williams, 553 U.S. at 306 (observing that vague statutes include those which define prohibited conduct by terms such as "annoying" or "indecent," requiring "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" (citing Reno, 521 U.S. at 870-71 & n.35; Coates v. Cincinnati, 402 U.S. 611, 614 (1971))).  During oral argument, the Attorney General conceded that her office is uncertain whether even Maureen Faulkner—the victim-catalyst for the legislation—could successfully obtain relief under the Act.  (Tr. 35:25 ("They could certainly attempt to . . . [but] I don't believe that they could necessarily secure it.")).  Such equivocality reflects the

_____

[9] Citations to "Tr. __" are to the transcript of oral argument, held March 30, 2015.

impossibility of defending this law: the weight of precedent has forced the Attorney General to contort the legislature's vision so as to render it unrecognizable from its original intent.  (See, e.g., id.)

Of further concern is the Act's use of the term "includes" in defining the conduct it regulates.  See 18 PA. CONS. STAT. § 11.1304(d).  The term implies that other, yet-unidentified conduct exists which might fall within the Act's scope.  At oral argument, counsel for the Attorney General hypothesized that the catchall phrase encompasses conduct such as harassment and stalking.  (See Tr. 40:6-25).  However, this interpretation is superfluous when juxtaposed against the balance of her argument: according to the Attorney General's papers, such behaviors are already verboten by the General Assembly's reference to "conduct which causes a temporary or permanent state of mental anguish."  (Abu-Jamal Doc. 36 at 22; PLN Doc. 33 at 22).  Moreover, as detailed *supra*, the Act's central limitation turns on the unknowable emotive responses of victims.  Short of clairvoyance, plaintiffs cannot determine in advance whether and to what extent a particular expression will impact a victim's sensibilities.  The result of these ambiguities is the very self-censorship identified by the Supreme Court as the hazard of vague legislation.  See FCC, 132 S. Ct. at 2317; see also Vill. of Hoffman Estates, 455 U.S. at 498-99.  The statute fails to provide reasonable persons with notice of what—or whose—conduct it endeavors to curtail.

These same concerns contribute to the statute's overbreadth.  Plaintiffs argue that the Act is boundless in its potential applications, encompassing in its scope virtually *any* expressive activity by any person who has ever been convicted

18

of a personal injury crime.  (Abu-Jamal Doc. 19 at 14; see also PLN Doc. 6 at 26-30).

The Attorney General agrees that *any* conduct which elicits mental anguish in a

victim might fall within the Act's inestimable sweep so long as that victim can prove

the fact of anguish in court.  (See Tr. 35:14-37:25).  Hence, the Act ostensibly affects

protected—and critically important—speech, including: pardon applications,

clemency petitions, and any testimony given in connection with those filings; public

expressions of innocence, confessions, or apologies; legislative testimony in support

of improved prison conditions and reformed juvenile justice systems; programs

encouraging at-risk youth to avoid lives of crime; or any public speech or written

work whatsoever, regardless of the speaker's intention or the work's relation to the

offense.  (See Abu-Jamal Doc. 19 at 15-16; PLN Doc. 6 at 28-29).  Absent well-

defined parameters, the four corners of the Act will quash important public

dialogues, as long as a victim can demonstrate "mental anguish."  18 PA. CONS.

STAT. § 11.1304(a), (d).

The Attorney General's proposed definition of the term "offender" further

compounds the overbreadth concerns borne of the statute's plain language.  When

pressed at oral argument to define the term, the Attorney General suggested that

even those who have merely been *accused* of a crime may be silenced by the Act; for

example, a pretrial detainee could be subject to civil liability for publicly professing

innocence during the colloquially termed "perp walk," well in advance of any

criminal adjudication of guilt.  (See Tr. 45:7-47:23).  Taken to its logical conclusion,

the Attorney General's statutory interpretation would limit an accused person's

right to profess his innocence before he is proven guilty.  Cf. Simon & Schuster, 502

U.S. at 121-22 (finding a similar regulation to be "overinclusive" when a person was neither accused nor convicted but admitted in written work to the crime). The court thus concludes that the Act is impermissibly vague and substantially overbroad in further violation of the United States Constitution.[10]

### C.   Permanent Injunctive Relief

The court's inquiry does not end with a determination that plaintiffs have succeeded on the merits. See Ciba-Geigy Corp., 747 F.2d at 850. Before the court may grant injunctive relief, plaintiffs must prove: *first*, that they have suffered irreparable injury; *second*, that legal remedies are inadequate to compensate that injury; *third*, that a remedy in equity is warranted after balancing the respective hardships between the parties; and *fourth*, that the public interest is not disserved by an injunction's issuance. See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006) (citing Amovo Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-13 (1982)). Each of these factors, measured against the significance of the Act's constitutional frailties, demands permanent injunctive relief.

---

[10] Finally, the court notes that the statute, in its present form, is incapable of judicial cure. The court is mindful that "when confronting a constitutional flaw in a statute, [it should] try to limit the solution to the problem." Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., __ U.S. __, 130 S. Ct. 3138, 3161 (2010) (quoting Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328-29 (2006)). However, the court must also "restrain [itself] 'from rewriting state law to conform it to constitutional requirements'. . . ." Ayotte, 546 U.S. at 329-330 (quoting Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 397 (1988)). The legislation before the court is unlawful in both purpose and implementation. Any judicial attempt to salvage the Revictimization Relief Act would result in a "far more serious invasion of the legislative domain" than this court may appropriately undertake. See id. at 330 (quoting United States v. Treasury Emps., 513 U.S. 454, 479 n.26 (1995)).

The first element is satisfied by the court's finding that the Revictimization Act violates plaintiffs' right to free expression.  The Attorney General asserts that plaintiffs cannot establish harm because their expression has not been chilled.  The factual record, the law of the case,[11] and governing precedent belie this assertion. The record offers several examples of plaintiffs censoring their own speech, or third parties denying them speaking opportunities, as a result of the Act.  (See, e.g., Joint Stip. ¶¶ 23-25, 37, 61, 91-92, 98, 147).  Further, the Third Circuit Court of Appeals recognizes that the violation of First Amendment rights "for even minimal periods of time unquestionably constitutes irreparably injury."  Swartzwelder v. McNeilly, 297 F.3d 228, 241 (3d Cir. 2002) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)) (citing Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998)); K.A. v. Pocono Mt. Sch. Dist., 710 F.3d 99, 113 (3d Cir. 2013).  Plaintiffs have suffered—and will continue to suffer—irreparable injury in the absence of immediate and permanent injunctive relief.

The remainder of the factors also weigh in favor of plaintiffs' request.  This court has held that injunctions are especially appropriate when violations of the First Amendment are concerned "because of the inadequacy of money damages." Stilp v. Contino, 743 F. Supp. 2d 460, 470 (M.D. Pa. 2010) (quoting Nat'l People's Action v. Wilmette, 914 F.2d 1008, 1013 (7th Cir. 1990)).  Monetary damages are woefully insufficient to cure the substantial violations of the right to free speech occasioned by the Revictimization Act.  See id. ("In [First Amendment] cases the

---

[11] In ruling on defendants' Rule 12 motions, the court held that plaintiffs have demonstrated a "chilling effect" directly flowing from the Revictimization Act.  See Abu-Jamal, 2015 WL 999194, at *7.

quantification of injury is difficult and damages are therefore not an adequate remedy." (quoting Flower Cab Co. v. Petitte, 685 F.2d 192, 195 (7th Cir. 1982))).

Similarly, the hardships faced by plaintiffs are considerable: the Act attempts to suppress expression at the very core of the First Amendment.  On balance, the hardships that defendants may experience fail to justify infringement of plaintiffs' rights: the state has no compelling interest in suppressing offensive speech, and to the extent the Act seeks to enjoin "harassing" or "taunting" behavior, as the Commonwealth alleges, the Attorney General concedes that state law already criminalizes such behavior.  (See Tr. 34:6-35:5).  Finally, the Third Circuit has held that suppressing protected expression does not advance any public interest.  See ACLU v. Reno, 217 F.3d 162, 180 (3d Cir. 2000), vacated on other grounds sub. nom., Ashcroft, 535 U.S. 564; K.A., 710 F.3d at 114 ("[T]he enforcement of an unconstitutional law vindicates no public interest." (citing ACLU v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003))).  Indeed, the public interest is enhanced—not disserved—by permanently enjoining enforcement of an unconstitutional statute. See id.  The court will grant plaintiffs' requests for permanent injunctive relief.[12]

---

[12] The PLN plaintiffs separately assert that the Act is an unconstitutional prior restraint of speech.  The court finds merit in the three principal arguments asserted jointly by the plaintiffs and declines to address this additional contention.

## V.   **Conclusion**

The First Amendment's guarantee of free speech extends to convicted felons whose expressive conduct is *ipso facto* controversial or offensive.  The right to free expression is the shared right to empower and uplift, and to criticize and condemn; to call to action, and to beg restraint; to debate with rancor, and to accede with reticence; to advocate offensively, and to lobby politely.  Indeed, the "high purpose" of the foremost amendment is perhaps best displayed through its protection of speech that some find reprehensible.  Johnson, 491 U.S. at 408-09 ("[Free speech] may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." (quoting Terminiello v. Chicago, 337 U.S. 1, 4 (1949))).  The United States Constitution precludes any state enactment that effectively limits expressive conduct when the essential injury is personal affront.[13]  See Coleman, 335 F. Supp. at 589.

The victims who have suffered at the hands of certain plaintiffs are not without remedies.  Victims are free to protest inmate speech through demonstrations, picketing, or public debate.  They may publish responsive leaflets and editorials.  As Maureen Faulkner did, victims may air their grievances to the

---

[13] To be sure, the right to free expression is not without limitation.  Various exceptions permit government regulation of speech which, *inter alia*, incites imminent violence, see Brandenburg v. Ohio, 395 U.S. 444, 447-48 (1969), includes obscene material, see Miller v. California, 413 U.S. 15, 18-19 (1973), or contains defamatory statements, see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 757-61 (1985), and nothing set forth in this memorandum should be construed as modifying the existing limitations on the right to free speech.  Notably, none of the recognized exceptions applies to the challenged statute.  The Revictimization Act falls on the basis of fundamental First Amendment principles.

press.  Indeed, the victims' discourse may include expressive conduct that plaintiffs themselves find objectionable.  The First Amendment does not evanesce at *any* gate, and its enduring guarantee of freedom of speech subsumes the right to expressive conduct that some may find offensive.


                                    /S/ CHRISTOPHER C. CONNER
                                    Christopher C. Conner, Chief Judge
                                    United States District Court
                                    Middle District of Pennsylvania


Dated:       April 28, 2015